## UNITED STATES *v.* PRIDGEON.

CERTIFICATE FROM THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 1070. Submitted March 13, 1894. — Decided April 16, 1894.

On November 12, 1890, in the Indian country, within the boundaries of Oklahoma Territory, as defined by the act of May 2, 1890, c. 182, 26 Stat. 81, horse stealing was not a crime against the United States, punishable under the act of February 15, 1888, c. 10, 25 Stat. 33; but as to the Cherokee outlet, it remained Indian country after the passage of the Act of May 2, 1890, and such an offence, committed there, continued to be an offence against the United States.

An indictment in the District Court of the United States within and for Logan County in Oklahoma Territory, and for the Indian country attached thereto, charging the commission of the offence of horse stealing in November, 1890, and laying the venue of the offence " at and within that

part of the Territory of Oklahoma attached for judicial purposes to Logan County," with a description of territory which included part of Oklahoma and part of the Cherokee Outlet not in Oklahoma, and which averred the same to be " then and there Indian country, and a place then and there under the sole and exclusive jurisdiction of the United States of America," will not be held to be fatally defective when attacked collaterally by writ of *habeas corpus.*

Under a writ of *habeas corpus* the inquiry is not addressed to errors, but to the question whether the proceedings and judgment are nullities; and unless it appears that the judgment or sentence under which the prisoner is confined is void, he is not entitled to his discharge.

Where a court has jurisdiction of the person and the offence, the imposition of a sentence in excess of what the law permits, does not render the legal or authorized portion of the sentence void, but only leaves such part of it as may be in excess open to question and attack.

In accordance with this principle the court answers the third question certified in the negative, without expressing an opinion as to what would have been the proper action of the Circuit Court in dealing with the prisoner's application.

THE case is stated in the opinion.

*Mr. Solicitor General* for the United States.

*Mr. D. K. Watson, Mr. A. H. Johnson,* and *Mr. E. C. Irvine* for Pridgeon.

MR. JUSTICE JACKSON delivered the opinion of the court.

At the September term, 1890, of the District Court for the First Judicial District of Logan County, Oklahoma Territory, and for the Indian country attached thereto for judicial purposes, sitting with the powers of a District Court of the United States of America, the appellee, Sidney S. Pridgeon, was regularly indicted for horse stealing by the grand jurors of the United States of America, within and for Logan County and that part of the Indian country attached thereto for judicial purposes, after having been first duly sworn, empanelled, and charged to inquire of offences against the laws of the United States committed therein. He was thereafter tried and convicted of the offence with which he was charged, and the court thereupon, on February 12, 1891, entered judgment upon the conviction as follows, that " the said Sidney S. Prid-

geon, for the said offence by him committed, be imprisoned in the Ohio state penitentiary at Columbus (and confined at hard labor) for the term of five years, said term to begin at 12 o'clock M. February 12, 1891, and to pay the costs of this prosecution, amounting to the sum of two hundred and thirty-two dollars and fifty-three cents, and to stand committed until the amount of said costs shall have been fully paid."

In pursuance of this sentence Pridgeon was transported to and confined in the Ohio state penitentiary, in which the usual discipline for prisoners confined therein includes "hard labor."

On July 7, 1893, Pridgeon applied to the United States Circuit Court for the Southern District of Ohio, Eastern Division, for a writ of *habeas corpus* to be discharged from the custody of the warden of the state penitentiary, alleging in his petition that he was wrongfully restrained of his liberty, first, because the court which tried, convicted, and sentenced him had no jurisdiction in the premises; and, second, that the sentence imposed was beyond the power and jurisdiction of the court, and therefore void. Upon the hearing of the petition, the Circuit Court, without passing upon the question of jurisdiction of the court which imposed the sentence, held that the prayer of the petitioner should be granted, for the reason that the sentence should have been for imprisonment alone, and that the imposition of "hard labor" as a part of the punishment rendered the whole sentence void, and thereupon the petitioner was discharged.   57 Fed. Rep. 200.   From this decision the United States appealed the case to the United States Circuit Court of Appeals for the Sixth Circuit. That court, in view of the important questions arising upon the record, and the doubt which it entertained as to the correct decision thereof, certified to this court the following questions:

"First. Was horse stealing on November 12, 1890, in the Indian country, within the boundaries of Oklahoma Territory, as defined by the act of Congress passed May 2, 1890, a crime against the United States, and punishable under the act of Congress passed February 15, 1888, denouncing horse stealing in the Indian Territory?

" Second. (Assuming the first question is answered in the negative.) Was the indictment against Pridgeon fatally defective on collateral attack by writ of *habeas corpus* in that it lays the venue of the offence ' at and within that part of the Territory of Oklahoma attached for judicial purposes to Logan County,' with a description of territory which includes part of Oklahoma and part of the Cherokee Outlet not in Oklahoma, and avers the same to be ' then and there Indian country, and a place then and there under the sole and exclusive jurisdiction of the United States of America ? '

" Third. Are the sentence of Pridgeon and his commitment in accordance therewith void by reason of the fact that they included as part of his punishment during his imprisonment in the Ohio penitentiary confinement at hard labor ? "

Assuming that the first question certified has reference to such parts of the Indian country as were embraced within the boundaries of Oklahoma Territory, and formed a part thereof, as defined and established by the act of May 2, 1890, c. 182, 26 Stat. 81, it admits of little or no doubt that this question must be answered in the negative. Indeed, the Solicitor General, on behalf of the United States, frankly and properly concedes that the act of February 15, 1888, c. 10, 25 Stat. 33, (the first section of which provides " that any person hereafter convicted in the United States courts having jurisdiction over the Indian Territory, or parts thereof, of stealing any horse, mare, gelding, filly, foal, ass, or mule, when said theft is committed in the Indian Territory, shall be punished by a fine of not more than one thousand dollars, or by imprisonment not more than fifteen years, or by both such fine and imprisonment, at the discretion of the court,") was superseded by the act of May 2, 1890, with respect to so much of the Indian Territory as was included within the boundaries and made a part of the Oklahoma Territory.

The act of May 2, 1890, which created the Territory of Oklahoma out of part of the Indian Territory, after defining the territorial limits of the new Territory, and vesting the executive power thereof in a governor; the legislative power in the governor, and a legislative assembly ; the judicial power in

a Supreme Court, district courts, probate courts, and justices of the peace, provided, by the eleventh section thereof, that certain named chapters and provisions of the Compiled Laws of the State of Nebraska, in force November 1, 1889, including part three, entitled the criminal code, " in so far as they are locally applicable, and not in conflict with the laws of the United States or with this act, are hereby extended to, and put in force in, the Territory of Oklahoma until after the adjournment of the first session of the legislative assembly of said Territory."

This provision of the act had the effect of establishing for the Territory of Oklahoma, until the first meeting and adjournment of its legislature, the criminal code of Nebraska. Among the criminal laws thus provisionally put in force in Oklahoma until after the adjournment of the first session of the legislature were sections 117 and 498 of the Nebraska criminal code, which provide that the punishment for horse stealing shall be imprisonment in the penitentiary for not more than ten years and for not less than one year, and " in all cases when any person shall be convicted of any offence, by this code declared criminal and made punishable by imprisonment in the penitentiary, the court shall declare in their sentence for what period of time within the respective periods prescribed by law such convict shall be imprisoned at hard labor in the penitentiary."

This criminal code remained in force from May 2, 1890, until December 24, 1890, when the first territorial legislature of Oklahoma adjourned. It thus clearly appears that the only law by which horse stealing within the territorial limits of Oklahoma, as defined by the act of May 2, 1890, could be punished on November 4 and 12, 1890, the dates of the offence for which Pridgeon was indicted, was the above criminal code of Nebraska which Congress adopted for the Territory. Larceny being a crime of local nature, it can hardly be supposed that Congress intended that the provisions of the act of February 15, 1888, prescribing punishment for horse stealing in the Indian Territory, should remain in force in the Territory of Oklahoma after the erection of the territorial government,

and the special adoption of the criminal code of Nebraska for the Territory until after the adjournment of its first legislature; or that the general provision of Rev. Stat. § 5356, relating to larceny " upon the high seas, or in any place under the exclusive jurisdiction of the United States," should apply to that Territory.

We are, therefore, clearly of opinion that the act of February 15, 1888, was not in force in the Territory of Oklahoma on November 4 and 12, 1890, but had been superseded by the provisions of section 11 of the act of May 2, 1890, adopting the criminal code of Nebraska as a provisional code for the Territory, and it follows that the first question certified by the Circuit Court of Appeals must be answered in the negative.

But, it is suggested on behalf of the United States, that the provisional and temporary adoption by Congress of the Nebraska criminal code for the Territory of Oklahoma had the effect of making larceny or horse stealing an offence against the United States, punishable on the Federal side of the courts of the Territory. The Supreme Court of the Territory has held that the criminal code of Nebraska, established by Congress, was to be treated as if it had been enacted by the territorial legislature, and was to be dealt with as if the crimes, thereby declared, were crimes not against the United States, but against the Territory. Thus in *Ex parte Larkin*, 1 Oklahoma, 53, 57, Green, C. J., says: " It was intended by Congress that the laws of Nebraska should constitute a *Territorial Code*, as distinguished from the laws of the United States in force in the Territory of Oklahoma, and that they should sustain the same relations to the courts and to the people of the Territory and to the legislative assembly as a code of laws enacted by the legislative assembly."

If, as suggested by counsel for the government, section 11 of the act of May 2, 1890, could be treated as establishing the provisional criminal code therein mentioned, as a law of the United States, and as creating offences against the Federal government, pending the first session and adjournment of the Oklahoma legislature, so as to make horse stealing during

that time a crime, not against the territorial government, but against the United States, the proceeding on the Federal side of the court was entirely lawful, the sentence of five years, as well as the imposition of "hard labor," being authorized by the Nebraska criminal code as above quoted.

It was certainly competent for Congress to have adopted the criminal code of Nebraska so as to make horse stealing a crime against the United States in the Oklahoma Territory, just as by section 5391, Revised Statutes, it has adopted the penal code of the States in respect to offences committed in forts, dock-yards, navy-yards, and other places ceded to the United States, where the offence is not prohibited, or the punishment thereof is not specially provided for by any law of the United States.

But we are of opinion that the Supreme Court of the Territory in *Ex parte Larkin* has taken the proper view of the effect of section 11 of the act of May 2, 1890, in holding that the laws of Nebraska were adopted as a territorial code, and this being so, a court of the United States did not have jurisdiction of the offence of horse stealing within the territorial limits of Oklahoma under the act of May 2, 1890, or by virtue of the Nebraska criminal code, provisionally adopted for the Territory.

It is contended by the appellee that inasmuch as the act of February 15, 1888, did not apply to the Territory of Oklahoma, and inasmuch as section 11 of the act of May 2, 1890, did not adopt the criminal code of Nebraska as a law of the United States, so as to make horse stealing in the Territory an offence against the United States, the District Court for the judicial district within and for Logan County, Oklahoma Territory, sitting as a court of the United States, had no jurisdiction over the offence charged against Pridgeon. This position, however, is not well taken. The boundaries of Oklahoma Territory, as defined by the act of May 2, 1890, creating a temporary government therefor, did not include the Cherokee Outlet. The first section of that act provides that " whenever the interest of the Cherokee Indians in the land known as the Cherokee Outlet shall have been extinguished, and the Presi-

dent shall make proclamation thereof, said outlet shall thereupon and without further legislation become a part of the Territory of Oklahoma." By the ninth section of the act, after defining the judicial power, and creating the courts for the Territory, and defining their jurisdiction, original and appellate, it was provided that the Territory should be divided into three judicial districts, and that a District Court should be held in each county thereof by one of the justices of the Supreme Court, at such time and place as may be prescribed by law, and " the territory not embraced in organized counties shall be attached for judicial purposes to such organized county or counties as the Supreme Court may determine; . . . and each of the said District Courts shall have and exercise, exclusive of any court heretofore established, the same jurisdiction in all cases arising under the Constitution and laws of the United States as is vested in the Circuit and District Courts of the United States."

In pursuance of the authority conferred upon it, of attaching territory not embraced in organized counties to organized counties for judicial purposes, the Supreme Court of the Territory, on October 6, 1890, entered an order, of which the following only is material : " It is ordered by the court that all of that part of the Cherokee Outlet which lies between the line dividing ranges three (3) and four (4) west of the Indian meridian, and the line dividing ranges six (6) and seven (7) east of the Indian meridian, except township twenty (20) of ranges one (1), two (2), three (3), and four (4) east of the Indian meridian ; and all of the lands occupied by the Kansas, Tonkawa, Ponca, Otoe, and Missouri tribes of Indians; and all of that part of land occupied by the Osage Indians which lies west of the line between ranges six (6) and seven (7) east of the Indian meridian ; and all that part of the Iowa and Kickapoo and Sac and Fox countries which lies north of the line which divides townships fourteen (14) and fifteen (15) north of ranges one (1), two (2), three (3), four (4), five (5), and six (6), east of the Indian meridian, is hereby attached to county number one (1), (Logan) for judicial purposes."

A comparison of the foregoing with the act of May 2, 1890,

shows that of the territory attached to Logan County for judicial purposes, by the order of the court, part was in Oklahoma, as established by the act creating the Territory, and part was in the Cherokee Outlet, not embraced within the boundaries of Oklahoma.

The part of the Cherokee Outlet so attached to Logan County for judicial purposes being " all that part of Cherokee Outlet which lies between the line dividing ranges three and four, west of the Indian meridian, and the line dividing ranges six and seven, east of the Indian meridian, except townships twenty of ranges one, two, three, and four, east of the Indian meridian," which part is outside of the boundaries of Oklahoma Territory.

It was further provided by section 9 of the act of May 2, 1890, that " in addition to the jurisdiction otherwise conferred by this act, said District Courts shall have and exercise exclusive original jurisdiction over all offences against the laws of the United States committed within that portion of the Cherokee Outlet not embraced within the boundaries of said Territory as herein defined;" and further, that "for all judicial purposes, as herein defined, such portion of the Cherokee Outlet not embraced within the boundaries of the Territory of Oklahoma shall be attached to, and be a part of, one of the judicial districts of said Territory as may be designated by the Supreme Court." That section also provided that "all acts and parts of acts heretofore enacted, conferring jurisdiction upon United States courts held beyond and outside the limits of the Territory of Oklahoma as herein defined, as to all causes of action or offences in said Territory, and in that portion of the Cherokee Outlet hereinbefore referred to, are hereby repealed, and such jurisdiction is hereby given to the Supreme and District Courts in said Territory."

By section 10 of the act "all offences committed in said Territory, if committed within any organized county, shall be prosecuted and tried within said county, and if committed within territory not embraced in any organized county, shall be prosecuted and tried in the county to which such territory shall be attached for judicial purposes."

It admits of no question that under these provisions the

District Court for the First Judicial District within and for Logan County, Oklahoma Territory, and for the Indian country attached thereto for judicial purposes, sitting as a District Court of the United States, had jurisdiction of offences committed against the laws of the United States in the Cherokee Outlet, which by the statute and the action of the Supreme Court was attached to Logan County, Oklahoma, for judicial purposes. It is equally clear in respect to the Cherokee Outlet so attached to Logan County, that it was at the passage of the act of May 2, 1890, and continued to be, Indian country, coming within the provisions of the act of February 15, 1888, and that the offence of horse stealing committed therein on November 4 and 12, 1890, was an offence against the United States. The provision of the ninth section, already referred to, clearly establishes the correctness of this conclusion, and the contention on the part of the appellee that the act of March 1, 1889, c. 333, 25 Stat. 783, establishing a United States court for the Indian Territory, and extending the jurisdiction of the United States courts over the Indian Territory, which was divided and annexed for judicial purposes to the District of Kansas and to the Eastern Judicial District of Texas, has no application to that portion of the Cherokee Outlet referred to in the ninth section of the act of May 2, 1890, attached to Logan County for judicial purposes. Neither is the Cherokee Outlet covered by section 29 of the act of May 2, 1890, it being expressly declared by section 9 of that act that "for all judicial purposes as herein defined such portion of the Cherokee Outlet not embraced within the boundaries of the Territory of Oklahoma shall be attached to, and be a part of, one of the judicial districts of said Territory, as may be designated by the Supreme Court;" and further, that "all acts and parts of acts heretofore enacted, conferring jurisdiction upon United States courts held beyond and outside the limits of the Territory of Oklahoma as herein defined, as to all causes of action or offences in said Territory, and in that part of the Cherokee Outlet hereinbefore referred to, are hereby repealed, and such jurisdiction is hereby given to the Supreme and District Courts in said Territory."

This language clearly shows that that portion of the Cherokee Outlet not embraced within the boundaries of the Territory of Oklahoma, but attached thereto for judicial purposes, was Indian country within the provisions of the act of February 15, 1888, and the offence of horse stealing committed therein was within the exclusive jurisdiction of the District Court of the First Judicial District of Oklahoma Territory, sitting as a court of the United States.

The courts created for the Territory of Oklahoma are clearly dual in their nature. They sit as territorial courts to administer the laws of the Territory and as courts of the United States to administer the laws of the United States. *Ex parte Crow Dog*, 109 U. S. 556, 559; *Ex parte Gon-Shay-ee*, 130 U. S. 343, 349.

The indictment charges the offence to have been committed in that part of Oklahoma attached to Logan County for judicial purposes, and described as follows: "All that part of the Cherokee Outlet which lies between the line dividing ranges three and four, west of the Indian meridian, and the line dividing ranges six and seven, east of the Indian meridian, except townships twenty of ranges one, two, three, and four, east of the Indian meridian, and all of the lands occupied by the Kansas, Tonkawa, Oteo, and Missouri tribes of Indians, and all that part of the land occupied by the Osage Indians which lies west of the line between ranges six and seven, east of the Indian meridian, and all that part of the Iowa and Kickapoo and Sac and Fox countries which lies north of the line which divides townships fourteen and fifteen north of ranges one, two, three, four, five, and six, east of the Indian meridian, in said Territory."

This description embraces that portion of the Cherokee Outlet lying west of the Indian meridian, and also a portion of the Territory of Oklahoma, being the same as that attached to Logan County for judicial purposes by the order of the Supreme Court of the Territory on October 6, 1890; so that in this description we have partly Oklahoma Territory and partly Indian Territory; but the indictment proceeds to aver that the offence was committed "at and within that part

of the Territory attached for judicial purposes to Logan County as aforesaid, which said part of said Territory was *then and there Indian country,* and a place and district of country then and there under the sole and exclusive jurisdiction of the United States of America."

This averment in the indictment has reference alone to the Cherokee Outlet, for the Outlet was the only Indian country not included in Oklahoma Territory, embraced within the order of the Supreme Court, and was the only place and district of country attached to Logan County for judicial purposes that was under the sole and exclusive jurisdiction of the United States. The indictment may, therefore, be fairly construed as charging the offence as having been committed in that portion of the Cherokee Outlet attached to Logan County for judicial purposes.

But whether this be so or not, it is very clear that there is nothing on the face of the indictment to show affirmatively that the District Court for the First Judicial District, within and for Logan County, Oklahoma Territory, and for the Indian country attached thereto for judicial purposes, sitting with the powers of a District Court of the United States, did not have jurisdiction of the offence for which Pridgeon was convicted, so as to render its sentence void on collateral attack. If the indictment does not fairly and sufficiently aver that the offence in question was committed in the Cherokee Outlet, it certainly does not show affirmatively upon its face that it was committed elsewhere, and without the jurisdiction of the court. It may be, that upon demurrer or writ of error, the indictment might have been found defective in not alleging with greater certainty the particular locality in which the offence was committed, within the rule laid down in *McBride* v. *The State,* 10 Humph. (Tenn.) 615, but it cannot be properly held that the indictment is so fatally defective on its face as to be open to collateral attack after trial and conviction, or that the sentence of the court pronounced thereon was void. The *habeas corpus* proceeding being a collateral attack of a civil nature, it must clearly and affirmatively appear that the indictment charged an offence of which the court had no juris-

diction, so that its sentence was void. This does not appear in the present case, and the second question certified must, therefore, be answered in the negative.

It being established that the court which sentenced Pridgeon had jurisdiction of his person and of the offence under the act of February 15, 1888, and that the indictment upon which he was tried and convicted is not void upon its face, so as to be open to collateral attack, is the sentence imposed, and the commitment in accordance therewith, void by reason of the fact that "hard labor" was included as a part of the sentence during the term of imprisonment in the Ohio penitentiary?

It admits of no question that the sentence, so far as it imposed imprisonment for the term of five years in the Ohio penitentiary, was regular and proper, and open to no objection. The question, therefore, narrows itself down to this: Was the sentence imposing that term of imprisonment rendered void by the addition of "hard labor" during his confinement?

In *Ex parte Karstendick*, 93 U. S. 396, 399, the claim was made on behalf of the petitioner that "where the punishment provided for by the statute is imprisonment alone, a sentence to confinement at a place where hard labor is imposed as a consequence of the imprisonment is in excess of the power conferred." Mr. Chief Justice Waite, speaking for the court, answered this contention by saying: "We have not been able to arrive at this conclusion. In cases where the statute makes hard labor a part of the punishment, it is imperative upon the court to include that in its sentence. But where the statute requires imprisonment alone, the several provisions which have been just referred to place it within the power of the court, at its discretion to order execution of the sentence at a place where labor is exacted as a part of the discipline and treatment of the institution or not, as it pleases. Thus a wider range of punishment is given, and the courts are left at liberty to graduate their sentences so as to meet the ever-varying circumstances of the cases which come before them. If the offence is flagrant, the penitentiary, with its

·discipline, may be called into requisition; but if slight, a corresponding punishment may be inflicted within the general range of the law."

In the subsequent case of *In re Mills*, 135 U. S. 263, 266, Mr. Justice Harlan said: "An offence which the statute imperatively requires to be punished by imprisonment 'at hard labor,' and one that must be punished by 'imprisonment,' but the sentence to which imprisonment the court may, in certain cases and in its discretion, require to be executed in a penitentiary where hard labor is prescribed for convicts, are each 'punishable' by imprisonment at hard labor. The former offence certainly must be thus punished; and as the latter may, in the discretion of the court, be so punished, it may also, and not unreasonably, be held to be 'punishable' by imprisonment at hard labor."

Under the rule announced in these cases, while the act of February 15, 1888, does not specifically authorize the imposition of "hard labor" as a part of the sentence of imprisonment, still it was competent for the court to sentence the party convicted to imprisonment in a penitentiary where "hard labor" is a part of the usual discipline; so that the provision for "hard labor" in the sentence is nothing more or less than a sentence to simple imprisonment in the Ohio penitentiary, subject to its rules, regulations, and discipline, and if the sentence had been imposed in this form it could not justify the release of the prisoner on *habeas corpus* under the rule above announced. It is doubtful whether upon a writ of error the prisoner would have been entitled to a modification of his sentence by striking out the "hard labor" portion thereof. By section 5539, Rev. Stat., it is provided that "whenever any criminal, convicted of any offence against the United States, is imprisoned in the jail or penitentiary of any State or Territory, such criminal shall in all respects be subject to the same discipline and treatment as convicts sentenced by the courts of the State and Territory in which such jail or penitentiary is situated; and while so confined therein shall be exclusively under the control of the officers having charge of the same, under the laws of such State or Territory."

Suppose the five years sentence had embodied the provision of this section — which it could lawfully have done — would it have carried with it, in point of fact, "hard labor" as a part of the discipline of the Ohio penitentiary? This being so, it is difficult to see upon what principle it can be held that the sentence of imprisonment is vitiated and rendered void for expressly including the element or feature of "hard labor," which would have been otherwise implied in the sentence of simple imprisonment.

In *In re Coy*, 127 U. S. 731, 757, Mr. Justice Miller, speaking for the court, said: "An imprisonment under a judgment cannot be unlawful, unless that judgment is an absolute nullity; and it is not a nullity if the court has general jurisdiction of the subject, although it should be erroneous."

Without undertaking to review the authorities in this and other courts, we think the principle is established that where a court has jurisdiction of the person and of the offence, the imposition of a sentence in excess of what the law permits does not render the legal or authorized portion of the sentence void, but only leaves such portion of the sentence as may be in excess open to question and attack. In other words, the sound rule is that a sentence is legal so far as it is within the provisions of law and the jurisdiction of the court over the person and offence, and only void as to the excess when such excess is separable, and may be dealt with without disturbing the valid portion of the sentence.

Many well-considered authorities, in England as well as in this country, hold that where there is jurisdiction of the person and of the offence, the excess in the sentence of the court beyond the provisions of law is only voidable in proceeding upon a writ of error. *Ex parte Lange*, 18 Wall. 163; *Sennott's Case*, 146 Mass. 489, 493; *People* v. *Kelly*, 97 N. Y. 212; *People* v. *Liscomb*, 60 N. Y. 559; *People* v. *Jacobs*, 66 N. Y. 8; *Ex parte Shaw*, 7 Ohio St. 81; *Ex parte Van Hagan*, 25 Ohio St. 426; *In re Graham*, 74 Wisconsin, 450; *Elsner* v. *Shrigley*, 80 Iowa, 30; *Ex parte Max*, 44 California, 579.

Under a writ of *habeas corpus* the inquiry is addressed not

to errors, but to the question whether the proceedings and the judgment rendered therein are, for any reason, nullities, and unless it is affirmatively shown that the judgment or sentence, under which the petitioner is confined, is void, he is not entitled to his discharge.

It may often occur that the sentence imposed may be valid in part and void in part, but the void portion of the judgment or sentence should not necessarily, or generally, vitiate the valid portion. Rev. Stat. § 761, "the court, or justice, or judge, shall proceed in a summary way to determine the facts of the case [in *habeas corpus*] by hearing the testimony and arguments, and thereupon to dispose of the party as law and justice require." There is no law or justice in giving to a prisoner relief under *habeas corpus* that is equivalent to an acquittal, when, upon writ of error, he could only have secured relief from that portion of the sentence which was void. In the present case the five years term of imprisonment, to which Pridgeon was sentenced, cannot properly be held void because of the additional imposition of "hard labor" during his confinement.

Thus in *In re Swan*, 150 U. S. 637, 653, it is stated that, " even if it was not within the power of the court to require payment of costs, and its judgment to that extent exceeded its authority, yet he cannot be discharged on *habeas corpus* until he has performed so much of the judgment, or served out so much of the sentence as it was within the power of the court to impose."

We have not deemed it necessary to review or to attempt to reconcile the authorities on the question, for the reason that while all concede that neither irregularities nor error, so far as they were within the jurisdiction of the court, can be inquired into upon a writ of *habeas corpus* — because a writ of *habeas corpus* cannot be made to perform the functions of a writ of error in relation to proceedings of a court within its jurisdiction — they differ widely as to what constitutes error, and what should be regarded as rendering the judgment or proceedings void.

We are clearly of opinion that the third question certified should be answered in the negative.

In answering this third question we have not considered it either necessary or proper to express any opinion as to what would have been the proper action of the Circuit Court in dealing with the petitioner's application. Whether the writ of *habeas corpus* should have been denied, and the petitioner put to his writ of error, or whether, after the allowance of the writ of *habeas corpus*, he should have been committed to the custody of the warden of the Ohio penitentiary, with directions to carry out and enforce only that portion of the sentence imposing imprisonment for five years, according to the rules, regulations, and discipline of the institution. These are matters which the Circuit Court of Appeals should settle and dispose of under the appeal of the United States from the judgment of the Circuit Court discharging the prisoner.

> *We accordingly direct that each of the three questions certified from the United States Circuit Court of Appeals for the Sixth Circuit be answered in the negative, and be so certified to that court.*