## State of Connecticut v. John Pastet

Cotter, Loiselle, MacDonald, Bogdanski and Longo, Js.

Argued April 4—decision released June 24, 1975

*James A. Wade,* special public defender, for the appellant (defendant).

*William F. Gallagher,* special assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, *Jerrold H. Barnett* and *Ernest J. Diette, Jr.,* assistant state's attorneys, for the appellee (state).

COTTER, J. On May 3, 1962, the defendant was indicted on a charge of murder in the first degree in perpetrating a robbery. After a trial the jury returned a verdict of guilty of murder in the first degree without recommending a sentence of life imprisonment which they were empowered to do under the law applicable at the time of trial, General Statutes § 53-10.[1] Subsequently, after the state moved for sentence, the court imposed the only other penalty prescribed by the statute pursuant to which the defendant was convicted, the sentence of death. An appeal from the judgment was taken to this court, which affirmed. *State* v. *Pastet,* 152

---

[1] "[General Statutes] Sec. 53-10. FIRST DEGREE MURDER, OTHER HOMICIDES; DEATH PENALTY OR LIFE IMPRISONMENT. Any person who commits murder in the first degree, or who causes the death of another by wilfully placing any obstruction upon any railroad or by loosening, taking up or removing any part of the superstructure of such railroad or by wilfully burning any building or vessel, shall suffer death unless the jury, by its verdict and as a part thereof, upon and after a consideration of all the evidence, recommends imprisonment in the State Prison for life, in which case the sentence of the court shall be imprisonment for life without benefit of release as provided in sections 18-7, 18-26 and 54-125, provided, if the person accused elects to be tried by the court and is found guilty or if such person is convicted by confession, the court may, in its discretion, imprison such person in the State Prison for life without the benefit of release as provided in sections 18-7, 18-26 and 54-125."

This statute has since been repealed. Public Acts 1969, No. 828, § 214.

An amendment to § 53-10, viz., Public Acts 1963, No. 588, had not been enacted at the time of trial and did not apply retroactively to the defendant's case. *State* v. *Pastet,* 152 Conn. 81, 85, 203 A.2d 287.

Conn. 81, 203 A.2d 287. No appeal or petition for certiorari to the United States Supreme Court was taken from that judgment.

While awaiting execution of the sentence, the defendant was declared insane by the Superior Court in Tolland County (*Barber, J.*) under General Statutes § 54-101 and transferred to the Norwich State Hospital and, subsequently, to the Security Treatment Center at Middletown for confinement, support and treatment, pending recovery of his sanity as provided by that statute. While thus confined, the defendant petitioned for a writ of habeas corpus in the Superior Court. At the hearing on this petition, the defendant testified in his own behalf in support of his claims that his constitutional rights were violated at his murder trial. This petition was denied (*Grillo, J.*) on June 19, 1972.

Thereafter, on June 29, 1972, the United States Supreme Court decided *Furman* v. *Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346, and companion cases. As that court's per curiam opinion established, certiorari in those cases was granted limited to a single question: "Does the imposition and carrying out of the dealth penalty in [these cases] constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments?" Id., 239. The holding answered that question in the affirmative in those cases considered, and the per curiam opinion continued: "The judgment in each case is therefore reversed *insofar as it leaves undisturbed the death sentence imposed, and the cases are remanded for further proceedings.*" (Emphasis added.) Id., 240. The statutes

involved in those cases[2] were not held unconstitutional per se; rather, only the imposition of death sentences pursuant to the authority conferred by these statutes was invalidated. See, e. g., *Eaton* v. *Capps,* 480 F.2d 1021, 1023 (5th Cir.). For those cases pending before the Supreme Court and for those in which a petition for certiorari had been filed, summary action was taken vacating the various judgments insofar as they left undisturbed the death penalty imposed and remanding the cases for further proceedings. Such was the disposition ordered, for example, in *Delgado* v. *Connecticut,* 408 U.S. 940, 92 S. Ct. 2879, 33 L. Ed. 2d 764, and *Davis* v. *Connecticut,* 408 U.S. 935, 92 S. Ct. 2856, 33 L. Ed. 2d 750. In both of these cases the death penalty had been imposed pursuant to § 53-10 and the judgments affirmed by this court. *State* v. *Delgado,* 161 Conn. 536, 290 A.2d 338; *State* v. *Davis,* 158 Conn. 341, 260 A.2d 587. Petitions for writs of certiorari were pending on these cases in the United States Supreme Court at the time of its decision in *Furman.* That court granted both petitions; on remand, this court in each case set aside the judgment insofar as it imposed the death penalty and then remanded each case to the Superior Court for further proceedings and the imposition of penalty. *State* v. *Delgado,* 163 Conn. 641, 297 A.2d 75; *State* v. *Davis,* 163 Conn. 642, 316 A.2d 512.

On September 15, 1972, the defendant filed a motion in this court to "reopen" the judgment in this case, "insofar as the imposition of the death penalty is concerned" and moved that the case be subsequently remanded to Superior Court for further proceedings. This court dismissed the

---

[2] Ga. Code §§ 26-1005, 26-1302 (Sup. 1971); Tex. Penal Code art. 1189 (1961).

motion "since the Superior Court still has jurisdiction of the case and over the person of the defendant," and ordered that "any proceedings to determine whether the defendant has recovered his sanity, how he should be confined, and for change of the sentence to life imprisonment because of the *Furman* decision must be pursued in that court." *State* v. *Pastet,* 164 Conn. 669, 671, 298 A.2d 784.

Thereafter, upon a motion of the defendant, the Superior Court ordered a psychiatric examination of the defendant to inquire into his "mental status" prior to resentencing proceedings. Counsel for the defendant and the state agreed upon the selection of a single psychiatrist of the court's choosing to conduct this examination. Dr. Jay Katz, the psychiatrist so appointed by the court, interviewed the defendant after talking to and receiving materials from counsel for both the defendant and the state, filed his report with the court, and subsequently testified at the sentencing hearing. Dr. Katz diagnosed the defendant as having "a personality disorder with passive aggressive tendencies and paranoid trends showing also evidence of immaturity." Nevertheless, he considered the defendant's testimony as set forth in the transcript of the hearing held on the habeas corpus petition on June 13, 1972, to be inconsistent with the finding of insanity made in 1965 pursuant to § 54-101. Finally, Dr. Katz believed that the defendant was able to undergo and participate in court proceedings without reverting to a psychotic state.

At the sentencing hearing, Dr. Joyce Millette, another psychiatrist, was called as a witness by the defendant. At the time of the proceedings she was employed by the State Department of Mental Health

and assigned to both the Security Treatment Center in Middletown and the Division of Alcohol and Drug Dependency in Hartford. The defendant had been her patient at the Security Treatment Center, and she had participated in and approved a decision to transfer the defendant on December 7, 1972, from the Treatment Center to the Connecticut Correctional Institution at Somers. At the time of the sentencing proceedings her diagnosis of the defendant's mental state was that "he both understood and related to the proceedings and was not psychotic."

On July 19, 1973, a little over a month before the sentencing proceedings, the defendant was returned to the Security Treatment Center following a series of incidents at the Correctional Institution during which he destroyed personal property in his cell and tried to injure himself. Before being transferred, however, he was examined by Dr. Jacob Van der Werff, a consulting psychiatrist at Somers for eleven years, who diagnosed the defendant at this time as "suffering from a personality disorder but as non-psychotic."

Both Drs. Millette and Katz submitted additional opinions to the court concerning the defendant's condition. Dr. Millette indicated that after sentence was imposed, the Security Treatment Center would be a "better place" for him than the Correctional Institution at Somers. In Dr. Katz's opinion, if the sentence to be imposed allowed release in a reasonable period of time, "then perhaps the defendant should be returned to a hospital for the express purpose of further rehabilitation but that it should be made quite clear to the defendant that this was not done because the court considered him to be insane."

The defendant, present at the sentencing hearing and at the time of sentence, when asked by the court if he had anything to say in his own behalf, responded: "Your Honor, I am not concerned about what happens to me. And I didn't have to come here and I don't want to be here and no matter what your decision is Your Honor, I will go on living the way I know I will have to live. If Mr. Rosoff [the victim] can't fulfill any life or happiness, I don't want any."

After these proceedings, the Superior Court (*Saden, J.*) sentenced the defendant to life imprisonment from which judgment the defendant has appealed.

## I

The defendant claims that the court lacked the authority, statutory or otherwise, to sentence him to life imprisonment, so that in imposing this sentence the court violated his rights under the due process clauses of the state[3] and federal[4] constitutions[5] and the separation of powers provision of the state constitution.[6] The essence of his claim is that under § 53-10 as it applied to this case the only procedure authorized by the statute for the imposition

---

[3] Constitution of Connecticut, art. first, § 8: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

[4] United States Constitution, amend. XIV, § 1: "[N]or shall any State deprive any person of life, liberty or property, without due process of law . . . ."

[5] We have held that the due process clauses of both constitutions have the same meaning. *Katz* v. *Brandon,* 156 Conn. 521, 537, 245 A.2d 579.

[6] Constitution of Connecticut, art. second: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."

of a sentence of life imprisonment was upon a recommendation to that effect by the jury in their discretion as part of their verdict; in sentencing the defendant to life imprisonment absent such a recommendation, he argues, the trial court exceeded its statutory authority and thereby violated his constitutional rights.

We stated on another occasion that the purpose of an identical provision in the statutory predecessor of § 53-10, viz., General Statutes § 3266d (Cum. Sup. 1955), empowering the jury to recommend life imprisonment instead of the otherwise mandatory death penalty in cases of first degree murder, was to make it possible for an act of clemency in behalf of a person convicted of this offense to take place at the trial stage of a criminal prosecution in the discretion of the jury. *State* v. *Walters*, 145 Conn. 60, 71–72, 138 A.2d 786. That statute, however, limited this discretionary power of the jury to the recommendation of a sentence of life imprisonment alone, so that under the statute two alternative forms of punishment, death and life imprisonment, were exclusively authorized upon a conviction of first degree murder. Ibid. As we have indicated, the decision of the United States Supreme Court in *Furman* did not render § 53-10 unconstitutional per se, but only the imposition and carrying out of the death penalty pursuant thereto. *Delgado* v. *Connecticut*, 408 U.S. 940, 92 S. Ct. 2879, 33 L. Ed. 2d 764; *Davis* v. *Connecticut*, 408 U.S. 935, 92 S. Ct. 2856, 33 L. Ed. 2d 750. Furthermore, there is no reason to suppose, nor is there any claim by the defendant, that *Furman* in any way invalidated in this case the jury's original verdict of guilty of first degree murder, such verdict remaining in force, as it were, upon the vacation of the constitutionally

invalid death sentence, to stand as the basis for a new and lawful sentence. *Moore* v. *Illinois,* 408 U.S. 786, 800, 92 S. Ct. 2562, 33 L. Ed. 2d 706; see *United States* v. *Pridgeon,* 153 U.S. 4°, 62, 14 S. Ct. 746, 38 L. Ed. 631; *State* v. *Kemp,* 126 Conn. 60, 86, 9 A.2d 63; 21 Am. Jur. 2d, Criminal Law, §§ 533, 536. Nor did *Furman* require courts, in resentencing prisoners convicted and sentenced to death under statutes analogous to § 53-10, to assume any discretionary authority not delegated to them by such statutes. See, e.g., *Bartholomey* v. *State,* 267 Md. 175, 185, 297 A.2d 696. Rather, the effect of *Furman* in this respect was merely to deprive the jury of the power to recommend life imprisonment in its discretion, and to require the imposition of sentence of life imprisonment as the only punishment prescribed for first degree murder by statutes such as § 53-10 which remained constitutionally intact. Ibid.; see also *Hubbard* v. *State,* 290 Ala. 118, 120, 274 So. 2d 298; *O'Neal* v. *State,* 253 Ark. 574, 582, 487 S.W.2d 618; *People* v. *Preston,* 9 Cal. 3d 308, 320, 508 P.2d 300; *Sullivan* v. *State,* 229 Ga. 731, 732, 194 S.E.2d 410; *State* v. *Franklin,* 263 La. 344, 349, 268 So. 2d 249; *Capler* v. *Mississippi,* 268 So. 2d 338, 339–40 (Miss.); *State* v. *Carroll,* 282 N.C. 326, 333–34, 193 S.E.2d 85; *Commonwealth* v. *Sharpe,* 449 Pa. 35, 296 A.2d 519; *State* v. *Speights,* 263 S.C. 127, 208 S.E.2d 43.

It would have been futile for the trial court to convene a jury for the purpose of "recommending" the only punishment which the court remained authorized under § 53-10 to impose on the defendant after *Furman* upon a conviction of first degree murder. Ibid. Although the principle is well established that penal statutes must be strictly construed, the application of common sense to the language

of a penal law is not to be excluded in a way which would involve absurdity or frustrate the evident design of the lawgiver. *State* v. *Langley,* 156 Conn. 598, 603, 244 A.2d 366, cert. denied, 393 U.S. 1069, 89 S. Ct. 726, 21 L. Ed. 2d 712; *State* v. *Faro,* 118 Conn. 267, 273, 171 A. 660.

In addition, while § 53-10 was repealed by the legislature by Public Acts 1969, No. 828, § 214, offenses committed prior to the effective date of the repealing statute were still punishable under the prior provision. Thus, the saving provision in chapter 1 of our General Statutes states that "[t]he repeal of an act shall not affect any punishment, penalty or forfeiture incurred before the repeal takes effect, . . . for an offense committed, or for the recovery of a penalty or forfeiture incurred under the act repealed." General Statutes § 1-1 (t). See *Dortch* v. *State,* 142 Conn. 18, 29, 110 A.2d 471. It has been held that when such a saving provision exists, a crime committed prior to the effective date of the repealing act remains punishable under the terms of the prior statute. *United States* v. *Reisinger,* 128 U.S. 398, 401, 9 S. Ct. 99, 32 L. Ed. 480; *Dortch* v. *State,* supra; 73 Am. Jur. 2d, Statutes, §§ 420–423; see also *Tinder* v. *United States,* 345 U.S. 565, 569, 73 S. Ct. 911, 97 L. Ed. 1250. Significantly, the defendant has not specifically claimed that the repeal of § 53-10 operated to render that statute inapplicable to his case. In short, the defendant's conviction under § 53-10 remained punishable by a sentence of life imprisonment after the effective date of the legislative repeal of that statute.[7] We conclude that the court's imposition of

[7] However, General Statutes § 53-10a provides: "Any person imprisoned in the State Prison who, prior to October 1, 1963, was sentenced under the provisions of section 53-10 of the general statutes to imprisonment in the State Prison for life without benefit

the sentence of life imprisonment on the defendant was authorized by § 53-10, and that the defendant's constitutional rights were not violated by such sentencing.

## II

Error is also assigned in the court's conclusion that the defendant was "judicially sane" when he was resentenced and the court imposed life imprisonment. Specifically, the defendant claims that the court was precluded from finding him sane for purposes of being resentenced by the earlier declaration of the Superior Court for Tolland County that he was insane for purposes of exemption from execution, a declaration which had not thereafter been formally modifiied pursuant to § 54-101. To begin with, the effect of the order of the Superior Court for Tolland County in 1965 issued pursuant to § 54-101 was, as the statute states, merely to stay the execution of the defendant's then sentence of death; the order had no impact on the trial court's jurisdiction over the case for other purposes. See *Fine* v. *Commonwealth*, 312 Mass. 252, 255–56, 44 N.E.2d 659; *People* v. *Eckert*, 179 Misc. 181, 183, 39 N.Y.S.2d 79; *In re Brown*, 19 Cal. App. 3d 659, 664, 97 Cal. Rptr. 71; 24 C.J.S., Criminal Law, § 1615. A stay of execution of a sentence only affects the carrying out of that sentence imposed by the trial court, not the power of the court to impose sentence. *State* v. *Barker*, 79 Neb. 361, 363, 112 N.W. 1143; 24 C.J.S., Criminal Law, § 1619. The determination pursuant to § 54-101 that the defend-

of release as provided in sections 18-7, 18-26 and 54-125 shall be eligible for the same release benefits provided under said sections as any person sentenced to imprisonment to the State Prison for life after October 1, 1963." This statute is clearly intended to apply to the defendant.

ant was "insane" for purposes of exemption from the carrying out of the death sentence, then, did not in and of itself render the trial court powerless to impose a lesser sentence of life imprisonment upon the defendant. Furthermore, in responding to the defendant's application for resentencing and in exercising its jurisdiction to that effect, the court was not obliged to await a subsequent determination that the defendant had recovered his "sanity" within the meaning of § 54-101; that statute requires such a determination only as a condition precedent to the carrying out of the death penalty, and, in fact, mandates execution once such a determination is made.

Nonetheless, the earlier determination that the defendant was "insane" under § 54-101 has remained formally undisturbed throughout this case. Thus, the central question raised by the defendant is whether, as applied to this case, the kind of "insanity" which immunizes a person from execution under a statute such as § 54-101 is the same as that which also immunizes him from imposition of sentence. Under Connecticut law, a criminal prosecution may not proceed against a person whom a court determines to be "so insane or mentally defective that he is unable to understand the proceedings against him or to assist in his own defense." General Statutes § 54-40 (c). The pertinent statutory provisions implement the early rule at common law that if it appeared at any time during a criminal trial that the accused was insane, the proper course was to discontinue the proceedings. *Wojculewicz* v. *Cummings,* 145 Conn. 11, 19, 138 A.2d 512, cert. denied, 356 U.S. 969, 78 S. Ct. 1010, 2 L. Ed. 2d 1075; 4 Blackstone, Commentaries Nos. 24, 395; note, 142 A.L.R. 961, 962; 14 Am. Jur., Criminal Law, § 44.

"Insanity," of course, has many meanings, in both legal and medical parlance, depending upon the context within which and the function for which the term is invoked. *Dodd* v. *Hughes,* 81 Nev. 43, 46-47, 398 P.2d 540; Redlich, "The Concepts of Health in Psychiatry," in Leighton, Explorations in Social Psychiatry 139-58. Just as the meaning to a psychiatrist of the diagnostic term "psychotic" as used to describe the condition of a patient for the purpose of prescribing and entering upon an appropriate course of treatment depends upon the particular type and stage of the patient's "psychosis" or disorder, Kolb, Noyes' Modern Clinical Psychiatry (7th Ed.) 326-412; so also does the law ascribe different meanings to the term "insane" as a description of a person's mental condition, depending upon the specific requirements and objective sought to be achieved by the particular judicial mechanism within which the question of the person's "sanity" arises. As a defense to crime, the issue of the defendant's insanity raises the question whether his mental condition at the time of the criminal act was such that he should not be held responsible for his conduct. See General Statutes § 53a-13; Goldstein, The Insanity Defense. For the purpose of civil commitment to a psychiatric institution, "insanity" usually comprehends some form of "incapacitation" or "mental illness" which renders its victim dangerous to himself or to other people or otherwise in need of care and treatment. See, e. g., General Statutes §§ 17-178, 17-183, 17-155y (a); Katz, Goldstein, & Dershowitz, Psychoanalysis, Psychiatry and Law 536-66. The "insanity" which disables a person from standing trial is customarily referred to as part and parcel of the "incompetency rule"; it relates to "the appropriateness of

conducting the criminal proceeding in light of the defendant's present inability" to stand trial; note, "Incompetency to Stand Trial," 81 Harv. L. Rev. 454; and involves a condition of the mind which is such that it "prevents the accused from comprehending his position and from consulting intelligently with counsel in the preparation of his defense." *Aponte* v. *State,* 30 N.J. 441, 450, 153 A.2d 665; cf. note, 3 A.L.R. 94. The law, in short, like the medical and social sciences, and like the arts, entertains no single, fixed concept of human nature and personality, but reserves unto itself the prerogative of describing a person's mental condition differently under different circumstances, and of disposing of his rights, his interests, and his destiny accordingly.

Of the objectives sought to be achieved by a determination of a person's sanity for purposes of standing trial, historically the foremost has been said to be the protection of the accuracy of the adjudication involved; the competency rule, that is, is claimed to have been designed to ensure that the defendant is able to provide his counsel with the data necessary or relevant to the structuring of a defense. See, e.g., *Dusky* v. *United States,* 362 U.S. 402, 403, 80 S. Ct. 788, 4 L. Ed. 2d 824; *State ex rel. Davey* v. *Owen,* 133 Ohio St. 96, 104, 12 N.E.2d 144; *Jordan* v. *State,* 124 Tenn. 81, 87, 135 S.W. 327; 1 Hale, History of the Pleas of the Crown, pp. 34–35. For this reason our statute on the question prohibits a criminal trial from proceeding upon a finding that the defendant is, inter alia, unable to "assist" in his defense. General Statutes § 54-40 (c).

But it has been pointed out that the competency rule is also meant to safeguard other values vital

to the legal order, including the overall fairness and dignity of the criminal process and the necessity for the defendant to "know why he is being punished" in order that the retributive, reformative, and deterrent functions of criminal punishment might reasonably be served. Note, "Incompetency to Stand Trial," 81 Harv. L. Rev. 454, 458; see also Hart, "The Aims of the Criminal Law," 23 Law & Contemp. Prob. 401, 404–06; Kadish & Paulsen, Criminal Law and Its Processes (2d Ed.) 554. This view explains the rule at common law and under certain statutes that a person was exempt not only from trial and conviction while unable to "understand the proceedings against him"; *Wojculewicz* v. *Cummings,* supra, 19; General Statutes § 54-40 (a), (c); but from the formal imposition of sentence as well. *Commonwealth ex rel. Smith* v. *Ashe,* 364 Pa. 93, 116–19, 71 A.2d 107, cited with approval, *United States ex rel. Smith* v. *Baldi,* 344 U.S. 561, 569, 73 S. Ct. 391, 97 L. Ed. 549; *McIntosh* v. *Pescor,* 175 F.2d 95, 98 (6th Cir.); *People* v. *Muniz,* 31 Ill. 2d 130, 136, 198 N.E.2d 855; notes, 142 A.L.R. 961, 974; 3 A.L.R. 94, 97; see also A.L.I., Model Penal Code, Proposed Official Draft § 4.04; Kadish & Paulsen, op. cit. 554. Such a theory likewise explains, at least in part, our requirement that sentence to imprisonment in the state prison may be pronounced only in the "presence and hearing" of the convicted person. General Statutes § 54-92; Practice Book § 482. See, e.g., *United States* v. *Gundelfinger,* 98 F. Sup. 630, 631 (W.D. Pa.).

When determining the legality of executing a person after sentence of death has been imposed, different information is required from that necessary upon an inquiry into his competency to be tried, convicted and sentenced. For example, some author-

ities have held that, in addition to the policies under-
lying the competency rules, there is an independent
justification for the rule exempting an "insane"
person from execution, viz., a person should not be
put to death if he is "unable to make his peace with
God" or attain to comparable spiritual consolation.
*Musselwhite* v. *State,* 215 Miss. 363, 371, 60 So. 2d
807; see *Caritativo* v. *California,* 357 U.S. 549, 559,
78 S. Ct. 1263, 2 L. Ed. 2d 1531 (opinion of Frank-
furter, J., dissenting); Hazard & Louisell, "Death,
the State, and the Insane: Stay of Execution," 9
U.C.L.A. L. Rev. 381, 387–88; cf. Shakespeare,
"Hamlet, Prince of Denmark," act III, scene iii,
lines 72–96; see also *In re Smith,* 25 N.M. 48, 59,
176 P. 819; *Solesbee* v. *Balkcom,* 339 U.S. 9, 20
n.3, 70 S. Ct. 457, 94 L. Ed. 604 (opinion of Frank-
furter, J., dissenting); note, 3 A.L.R. 94, 98. Thus,
a person who is "insane" within the meaning of the
rule exempting mentally disabled persons from exe-
cution is not necessarily "insane" within the mean-
ing of the rules precluding incompetent persons
from trial, conviction and sentencing.

Accordingly, the primary task before the trial
court in this case during the hearing conducted
prior to its imposition of the sentence of life impris-
onment was to determine whether the defendant
was able to understand the nature of the sentencing
proceedings, i.e., why he was being punished and
the nature of his punishment.[8] It was under no
obligation to consider itself bound by the earlier

---

[8] Since the court had no alternative but to impose sentence of life
imprisonment pursuant to the provisions of General Statutes § 53-10
then in force, there was no need for it to determine whether the
defendant was also able to "assist" in these proceedings, e.g., to pro-
vide or help provide evidence of the existence of "mitigating fac-
tors." See General Statutes § 53a-46a (Rev. to 1975). Nonetheless,
the court did conclude that the defendant "was capable of aiding

declaration of the Superior Court for Tolland County in 1965 that the defendant was "insane" for purposes of exemption from execution of the prior death sentence, a declaration made after conviction and pursuant to General Statutes § 54-101. From its observation of the defendant, from the reports of the psychiatrists who personally examined the defendant, and from the defendant's own testimony, all of which were included in its finding of facts, the court could reasonably have concluded that the defendant was "judicially sane" for the purpose of imposition of sentence. See *Dusky* v. *United States,* supra.

There is no error.

In this opinion the other judges concurred.

counsel," upon reviewing the testimony and exhibits introduced at the hearing. We need not determine whether such determination was required by the rationale of the competency rule as applied to sentencing proceedings. See *State* v. *Hoyt,* 47 Conn. 518, 545. But see also *Green* v. *United States,* 365 U.S. 301, 304, 81 S. Ct. 653, 5 L. Ed. 2d 670; *Taylor* v. *United States,* 285 F.2d 703, 705 (9th Cir.).