BOYD et al. v. GREAT WESTERN COAL & COKE CO.

(Circuit Court, E. D. Oklahoma. July 17, 1911.)

No. 1,435.

1. REMOVAL OF CAUSES (§ 25*)—FEDERAL QUESTION.

While defendant may set up a federal question as a defense to an action in the state court and on an adverse ruling may test the question in the Supreme Court of the United States by writ of error, the case cannot be removed to a federal court from the state court because involving a federal question, appearing only from the facts alleged in the petition for removal, and not from plaintiff's statement of his case in his complaint or petition.

[Ed. Note.—For other cases, see Removal of Causes, Cent. Dig. §§ 58, 59; Dec. Dig. § 25.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. REMOVAL OF CAUSES (§ 19*)—GROUND—FEDERAL QUESTION—"FEDERAL COR-
PORATION."

Act Feb. 18, 1901, c. 379, 31 Stat. 794, extended over Indian Territory
certain laws of Arkansas relating to corporations making the Arkansas
law a part of the act of Congress as though incorporated therein in hæc
verba. Held, that a private corporation organized in Indian Territory
under such law prior to statehood was not a federal corporation in the
sense of being incorporated under a federal law so as to authorize it to
remove actions against it in the state courts after the territory became
a state.

[Ed. Note.—For other cases, see Removal of Causes, Cent. Dig. §§ 37–
48; Dec. Dig. § 19.*]

At Law. Action by Maggie Boyd and others against the Great
Western Coal & Coke Company. On motion to remand. Granted.

H. H. Smith, for plaintiffs.

James H. Gordon, for defendant.

CAMPBELL, District Judge. The matter now before the court
in this case arises on plaintiff's motion to remand this cause. This is a
suit for damages for the death of the husband and father of plain-
tiffs, while engaged by defendant as a coal miner, originally instituted
in the district court of Latimer county, Okl. Plaintiff's petition
charged that the defendant is a domestic corporation organized under
the laws of Oklahoma, and alleges as grounds of recovery various
failures on the part of defendant to comply with the state laws reg-
ulating the operation of coal mines. In due time the defendant filed
in the state court its petition and bond for removal to this court,
alleging that it is a corporation other than a banking corporation
incorporated under the laws of the United States of America on the
22d day of July, 1902, and now operating under such laws, and, as
such, is a federal corporation, and has a defense to this suit arising
under and by virtue of the laws of the United States, to wit, its
act of incorporation.

In the petition for removal it is further pointed out that the various
breaches of duty relied upon in the petition arise from the alleged
failure of the defendant to comply with certain provisions of the
state laws relating to coal mines, and that the defendant is operating
under leases from the United States, pursuant to certain rules and
regulations prescribed in connection therewith, and under certain
acts of Congress, relating thereto, with which the requirements of
said state laws conflict, or act in derogation thereof, or imposing upon
defendant additional burdens, all of which, it is contended, the state
is without power to do, and that the determination of defendant's
liability in this cause depends upon the construction of the federal and
state statutes referred to.

[1] But a perusal of the plaintiff's petition fails to disclose any
such federal question, and it is now settled that in such case, while
the defendant may set up a federal question as a defense to the action
in the state court, and on adverse ruling thereon by the highest state
court may test the question in the Supreme Court on writ of error

to the state court, the cause cannot be removed from the state court to a federal court unless the plaintiff's statement of his case in his complaint or petition necessarily discloses such federal question, and, if it does not so appear, the want cannot be supplied by any statement in the petition for removal. Chappel v. Waterwords, 155 U. S. 102, 15 Sup. Ct. 34, 39 L. Ed. 85; Texas & Pacific R. R. Co. v. Cody, 166 U. S. 606, 17 Sup. Ct. 703, 41 L. Ed. 1132. Therefore unless the defendant is a corporation organized and existing under the laws of the United States, in such sense as to bring it within those decisions of the Supreme Court relating to the right of removal of causes by federal corporations, the motion to remand must be sustained.

[2] By Act Cong. Feb. 18, 1901, c. 379, 31 Stat. 794, certain provisions of the law of Arkansas relating to corporations were extended over and put in force in Indian Territory, with such substitution of terms as to make them applicable. Prior to this act no provision of law existed for the creation of corporations for the conduct of business in its nature local to Indian Territory. By the adoption of the sections of the Arkansas law specified a complete system of laws for the creation and control of corporations within the Indian Territory was provided. While it was accomplished by an act of Congress, and the sections of the Arkansas law adopted became as much a part of the act as if set forth in hæc verba therein, it was in effect very similar to the laws of the several states relating to the creation and control of domestic corporations, in that its operation was confined to the territory comprised within what was known as Indian Territory. The defendant was organized as an Indian Territory corporation prior to statehood under the terms of the foregoing act, and contends that it thereby became and is a federal corporation, organized and existing under the laws of the United States, and, as such, is entitled to remove this cause to this court. This presents the question as to whether a corporation organized under the laws in force in Indian Territory may, after statehood, when made defendant in a cause in a state court involving the jurisdictional amount, remove the same to the federal court solely on the ground that it is a corporation organized and existing under the laws of the United States. In behalf of its contention the defendant cites, among other authorities, Canary Oil Co. v. Standard Asphalt Co. (C. C.) 182 Fed. 663, from the Circuit Court for the District of Kansas, wherein this question was presented and the right of removal upheld by that court. As suggested in that opinion, the question is whether these corporations originally organized under the laws of Indian Territory may now be said to be corporations organized and existing under the laws of the United States in such sense that causes in which they are defendants may be removed from a state to a federal court solely on the ground that, by reason of their original creation under the general act of Congress providing for corporations in Indian Territory, such cases may be said to arise under the laws of the United States, as contradistinguished from suits to which corporations created under the laws of an organized territory may be parties.

The effect of the intervention of statehood upon corporations created under the laws of an organized territory is thus tersely stated by Justice Field in Kansas Pacific R. Co. v. Atchison, etc., R. Co., 112 U. S. 414, 5 Sup. Ct. 208, 28 L. Ed. 794:

"The admission of Kansas as a state into the Union, and the consequent change of its form of government, in no respect affected the essential character of the corporations or their powers or rights. They must after that change be considered as corporations of the state, as much so as if they had derived their existence from its legislation. As its corporations they are to be treated, so far as may be necessary to enforce contracts or rights of property by or against them, as citizens within the clause of the Constitution declaring the extent of the judicial power of the United States. It has been expressly held that they are to be so considered when they have controversies with citizens of other states. And the same course of reasoning which led to this decision must also lead to the conclusion that in all cases where a federal court can take jurisdiction of like controversies between corporations, and treat them as citizens of the state under whose laws they were created or continue to exist."

It follows that if Congress had seen fit to provide by organic act for a territorial form of government in Indian Territory, and the Legislature of the territory so established had enacted a law providing for domestic corporations, and the defendant had been organized under that law, rather than a direct act of Congress, there would be no question of its status now as a domestic corporation of the state, and, of course, could not remove this case to this court, for a corporation organized under the laws of a territory is not a federal corporation, not being organized under the laws of the United States. Maxwell v. Federal Gold & Copper Co., 155 Fed. 110, 83 C. C. A. 570, and cases cited. So that, as suggested, the question here is whether the fact that Indian Territory corporations were organized under direct legislation of Congress, rather than territorial acts, constitutes them federal corporations, and makes any case to which any one of them may be now a party one arising under the laws of the United States, and cognizable in or removable to a federal court, notwithstanding Congress has since by the enabling act (June 16, 1906, c. 3335, 34 Stat. 275 [U. S. Comp. St. Supp. 1909, p. 154]) provided for the admission of the Indian Territory as a portion of the sovereign state of Oklahoma.

Now let us see what precisely is the relation of a territorial government to the general government. That question is so fully answered by Mr. Justice Bradley in Mormon Church v. United States, 136 U. S., loc. cit. 42, 10 Sup. Ct. 802, 34 L. Ed. 478, that I cannot do better than quote his language. Prior to the organization of the territory of Utah, the Mormons had set up there a provisional government, known as the "State of Deseret," by the legislature of which an act was passed incorporating "The Church of Jesus Christ of Later Day Saints." After the organization of the territory, the territorial Legislature, by certain acts, gave validity to this corporation. Thereafter Congress passed acts abolishing polygamy, and disapproving and annulling the act incorporating the church and the acts of the territorial Legislature validating the same. The power of Congress to so legislate was attacked, and of its validity Justice Bradley said:

"The power of Congress over the territories of the United States is general and plenary, arising from and incidental to the right to acquire the territory itself, and from the power given by the Constitution to make all needful rules and regulations respecting the territory or other property belonging to the United States. It would be absurb to hold that the United States has power to acquire territory, and no power to govern it when acquired. The power to acquire territory other than the territory northwest of the Ohio river (which belonged to the United States at the adoption of the Constitution) is derived from the treaty-making power or the power to declare and carry on war. The incidents of these powers are those of national sovereignty, and belong to all independent governments. The power to make acquisitions of territory by conquest, by treaty, and by cession is an incident of national sovereignty. The territory of Louisiana, when acquired from France, and the territories west of the Rocky Mountains, when acquired from Mexico, became the absolute property and domain of the United States, subject to such conditions as the government in its diplomatic negotiations had seen fit to accept relating to the rights of the people then inhabiting those territories. Having rightfully acquired said territories, the United States government was the only one which could impose laws upon them, and its sovereignty over them was complete. No state of the Union had any such right of sovereignty over them; no other country or government had any such right. These propositions are so elementary, and so necessarily follow from the condition of things arising upon the acquisition of new territory, that they need no argument to support them. They are self-evident. Chief Justice Marshall in the case of the American Insurance Company v. Canter, 1 Pet. 511, 542 [7 L. Ed. 242], well said: 'Perhaps the power of governing a territory belonging to the United States, which has not by becoming a state acquired the means of self-government, may result necessarily from the facts, that it is not within the jurisdiction of any particular State, and is within the power and jurisdiction of the United States. The right to govern may be the inevitable consequence of the right to acquire territory. Which ever may be the source whence the power is derived, the possession of it is unquestioned.' And Mr. Justice Nelson delivering the opinion of the court in Benner v. Porter, 9 How. 235, 242 [13 L. Ed. 119], speaking of the territorial governments established by Congress, says: 'They are legislative governments, and their court's legislative courts, Congress, in the exercise of its powers in the organization and government of the territories, combining the powers of both the federal and state authorities. Chief Justice Waite in the case of National Bank v. County of Yankton, 101 U. S. 129, 133 [25 L. Ed. 1046], said: 'In the organic act of Dakota there was not an express reservation of power in Congress to amend the acts of the territorial Legislature, nor was it necessary. Such a power is an incident of sovereignty, and continues until granted away. Congress may not only abrogate laws of the territorial Legislatures, but it may itself legislate directly for the local government. It may make a void act of the territorial Legislature valid, and a valid act void. In other words, it has full and complete legislative authority over the people of the territories and all the departments of the territorial governments. It may do for the territories what the people, under the Constitution of the United States, may do for the states.' In a still more recent case, and one relating to the legislation of Congress over the territory of Utah itself (Murphy v. Ramsey, 114 U. S. 15, 44 [5 Sup. Ct. 747, 763, 29 L. Ed. 47]), Mr. Justice Matthews said: 'The counsel for the appellants in argument seem to question the constitutional power of Congress to pass the act of March 22, 1882, so far as it abridges the rights of electors in the territory under previous laws. But that question is, we think, no longer open to discussion. It has passed beyond the stage of controversy into final judgment. The people of the United States as sovereign owners of the national territories, have supreme power over them and their inhabitants. In the exercise of this sovereign dominion, they are represented by the government of the United States, to whom all the powers of government over that subject have been delegated, subject only to such restrictions as are expressed in the

Constitution, or are necessarily implied in its terms.' Doubtless Congress in-
legislating for the territories would be subject to those fundamental limita-
tions in favor of personal rights which are formulated in the Constitution and
its amendments; but these limitations would exist rather by inference and the-
general spirit of the Constitution from which Congress derives all its powers
than by any express and direct application of its provisions. . The supreme-
power of Congress over the territories and over the acts of the territorial
Legislatures established therein is generally expressly reserved in the organic
act establishing governments in said territories. This is true of the territory
of Utah. In the sixth section of the act establishing a territorial government
in Utah approved September 9, 1850, it is declared 'that the legislative pow-
ers of said territory shall extend to all rightful subjects of legislation, con-
sistent with the Constitution of the United States and the provisions of this-
act. * * * All the laws passed by the Legislative Assembly and Governor
shall be submitted to the Congress of the United States, and if disapproved
shall be null and of no effect.' 9 Stat. 454."

In Snow. v. United States, 18 Wall., loc. cit. 319, 320, 21 L. Ed.
784, it is said:

"The government of the territories of the United States belongs, primarily,.
to Congress; and, secondarily, to such agencies as Congress may establish
for that purpose. During the term of their pupilage as territories, they are-
mere dependencies of the United States. Their people do not constitute a
sovereign power. All political authority exercised therein is derived from the-
general government. It is, indeed, the practice of the government to invest
these dependencies with a limited power of self-government as soon as they
have sufficient population for the purpose. The extent of the power thus-
granted depends entirely upon the organic act of Congress in each case,
and it is at all times subject to such alterations as Congress may see fit to-
adopt. * * * Strictly speaking, there is no sovereignty in a territory of
the United States, but that of the United States itself. Crimes committed
therein are committed against the government and dignity of the United
States. It would seem that indictments and writs should regularly be in the-
name of the United States, and that the attorney of the United States was-
the proper officer to prosecute all offenses. But the practice has been other-
wise, not only in Utah, but in other territories organized upon the same type."

In Sims v. Sims, 175 U. S., loc. cit. 168, 20 Sup. Ct. 60, 44 L. Ed.
115, it is said:

"In the territories of the United States, Congress has the entire dominion
and sovereignty, national and local, federal and state, and has full legislative-
power over all subjects upon which the Legislature of a state might legislate-
within a state, and may, at its discretion, intrust that power to the legisla-
tive assembly of a territory."

In Binns v. United States, 194 U. S. 491, 24 Sup. Ct. 817, 48 L. Ed.
1087, Justice Brewer said:

"It must be remembered that Congress, in the government of the territories-
as well as of the District of Columbia, has plenary power, save as controlled
by the provisions of the Constitution, that the form of government it shall-
establish is not prescribed, and may not necessarily be the same in all the-
territories. We are accustomed to that generally adopted for the territories-
of a quasi state government, with executive, legislative, and judicial officers,.
and a Legislature endowed with the power of local taxation and local ex-
penditures, but Congress is not limited to this form. In the District of Col-
umbia it has adopted a different mode of government, and in Alaska still an-
other. It may legislate directly in respect to the local affairs of a territory
or transfer the power of such legislation to a Legislature elected by the-
citizens of the territory. It has provided in the District of Columbia for a
board of three commissioners, who are the controlling officers of the district.

It may intrust to them a large volume of legislative power, or it may by direct legislation create the whole body of statutory law applicable thereto. For Alaska Congress has established a government of a different form. It has provided no legislative body, but only executive and judicial officers. It has enacted a penal and civil code. Having created no legislative body and provided no local legislation in respect to the matter of revenue, it has established a revenue system of its own, applicable alone to that territory. Instead of raising revenue by direct taxation upon property, it has, as it may rightfully do, provided for that revenue by means of license taxes."

From the foregoing authorities, it appears that the Legislatures of the several organized territories are mere agencies of Congress, for the purpose of representing it locally in making laws for the government of their internal affairs. The act of a territorial Legislature providing for the creation of domestic corporations, while not in form a direct act or law of Congress, it seems to me is not essentially different from direct congressional legislation to that end, because it is the act of a congressional agency established by Congress to relieve it of the burden of such local legislation. But the Legislature is still only its agent, and nothing more, and Congress may at any time step in and legislate directly with regard to any matter of local concern. Suppose in one of the organized territories Congress should exercise its right to legislate directly regarding the creation of corporations within its territorial limits, as it did within the territorial limits of the unorganized Indian Territory, and abolish all prior territorial legislation on the subject, and thereafter corporations should be organized under the act and then such territory should become a state, could it be successfully contended that such corporations, after statehood, were federal corporations, rather than corporations of the state, as held in Kansas & Pacific R. Co. v. Atchison R. R. Co., supra? I think not. If a Legislature of an organized territory is merely a congressional agency for the enactment of laws local to the territory, and in the establishment of such agency Congress still retains the right at any time to legislate directly upon any subject of local concern, what essential difference is there between the legislation of the agent, the territorial Legislature, and that of the principal, Congress? I can conceive of none. If, then, the only difference between an organized and unorganized territory, as regards necessary local legislation, is that in the former Congress, while retaining its power to legislate directly has for its own convenience established a local legislative agency, to enact such legislation as it may not see fit to directly enact, while in the latter all local legislation comes directly from Congress, what essential difference could there be between the direct legislation of Congress controlling a matter of local concern within an organized territory, and such legislation controlling a matter of local concern within an unorganized territory? Manifestly none. In the Pridgeon Case, 153 U. S. 48, 14 Sup. Ct. 746, 38 L. Ed. 631, the court said:

"But it is suggested on behalf of the United States that the provisional and temporary adoption by Congress of the Nebraska Criminal Code for the territory of Oklahoma had the effect of making larceny or horse stealing an offense against the United States punishable on the federal side of the courts of the territory. The Supreme Court of the territory has held that the

Criminal Code of Nebraska, established by Congress, was to be treated as if it had been enacted by the territorial Legislature, and was to be dealt with as if the crimes thereby declared were crimes not against the United States, but against the territory. Thus in Ex parte Larkin, 1 Okl. 53, 57 [25 Pac. 745, 746 (11 L. R. A. 418)], Green, C. J., says: 'It was intended by Congress that the laws of Nebraska should constitute a territorial code, as distinguished from the laws of the United States in force in the territory of Oklahoma, and that they should sustain the same relations to the courts and to the people of the territory and to the legislative assembly as a code of laws enacted by the legislative assembly.' If, as suggested by counsel for the government, section 11 of the act of May 2, 1890, c. 182 [26 Stat. 81], could be treated as establishing the provisional criminal code therein mentioned, as a, law of the United States, and as creating offenses against the federal government, pending the first session and adjournment of the Oklahoma Legislature, so as to make horse stealing during that time a crime, not against the territorial government, but against the United States, the proceeding on the federal side of the court was entirely lawful, the sentence of five years, as well as the imposition of 'hard labor,' being authorized by the Nebraska Criminal Code as above quoted. It was certainly competent for Congress to have adopted the Criminal Code of Nebraska so as to make horse stealing a crime against the United States in the Oklahoma Territory, just as by section 5391, Revised Statutes [U. S. Comp. St. 1901, p. 3651], it has adopted the Penal Code of the states in respect to offenses committed in forts, dock yards, navy yards, and other places ceded to the United States, where the offense is not prohibited, or the punishment thereof is not specially provided for by any law of the United States. But we are of opinion that the Supreme Court of the territory in Ex parte Larkin has taken the proper view of the effect of section 11 of the act of May 2, 1890, in holding that the laws of Nebraska were adopted as a territorial code, and, this being so, a court of the United States did not have jurisdiction of the offense of horse stealing within the territorial limits of Oklahoma under the act of May 2, 1890, or by virtue of the Nebraska Criminal Code, provisionally adopted for the territory."

The case to which all later decisions involving the question of removal of causes by federal corporations mainly refer is that of Osborn v. United States Bank, 9 Wheat. 738, 6 L. Ed. 204, decided by Chief Justice Marshall. The bank was organized under special act of Congress, and the question was as to the validity of that portion of the act expressly giving the bank the power to sue and be sued in the court of the United States, and the determination of that question was held to rest upon the question as to whether the case was one arising under a law of the United States, because of the fact of its existence under an act of Congress. The court held that it was such a case, saying:

"The case of the bank is, we think, a very strong case of this description. The charter of incorporation not only creates it, but gives it every faculty which it possesses. The power to acquire rights of any description, to transact business of any description, to make contracts, is given and measured by its charter, and that charter is a law of the United States. This being can acquire no right, make no contract, bring no suit, which is not authorized by a law of the United States. It is not only itself the mere creature of a law, but all its actions and all its rights are dependent on the same law. Can a being, thus constituted, have a case which does not arise literally, as well as substantially, under the law? * * * It is said that a clear distinction exists between the party and the cause; that the party may originate under a law with which the cause has no connection; and that Congress may, with the same propriety give a naturalized citizen, who is the mere creature of law, a right to sue in the courts of the United States, as give that right

to the bank. This distinction is not denied; and if the act of Congress was a simple act of incorporation, and contained nothing more, it might be entitled to great consideration. But the act does not stop with incorporating the bank. It proceeds to bestow upon the being it has made, all the faculties and capacities which that being possesses. Every act of the bank grows out of this law, and is tested by it. To use the language of the Constitution, every act of the bank arises out of this law. A naturalized citizen is, indeed, made a citizen under an act of Congress, but the act does not proceed to give, to regulate, or to prescribe his capacities. He becomes a member of the society, possessing all the rights of a native citizen, and standing, in the view of the Constitution, on the footing of a native. The Constitution does not authorize Congress to enlarge or abridge those rights. The simple power of the national Legislature is to prescribe a uniform rule of naturalization, and the exercise of this power exhausts it, so far as respects the individual. The Constitution then takes him up, and, among other rights, extends to him the capacity of suing in the courts of the United States precisely under the same circumstances under which a native might sue. He is distinguishable in nothing from a native citizen; except so far as the Constitution makes the distinction. The law makes none. There is, then, no resemblance between the act incorporating the bank and the general naturalization law."

In the Pacific Railroad Removal Cases, 115 U. S. 1, 5 Sup. Ct. 1113, 29 L. Ed. 319, wherein was raised the question of the right of the several railroad companies, organized under acts of Congress, to remove suits instituted against them in the state courts to the federal courts, the court reviewed Osborn v. Bank, supra, and, after quoting the foregoing portion of the opinion in that case, said:

"If the case of Osborn v. Bank of the United States is to be adhered to as a sound exposition of the Constitution, there is no escape from the conclusion that these suits against the plaintiffs in error, considering the said plaintiffs as corporations created by and organized under the acts of Congress referred to in the several petitions for removal in these cases, were and are suits arising under the laws of the United States. An examination of those acts of Congress shows that the corporations now before us, not only derive their existence, but their powers, their functions, their duties, and a large portion of their resources, from those acts, and by virtue thereof sustain important relations to the government of the United States."

In the case of the bank above referred to, it is noted that its operation was of national extent and was closely related to the fiscal affairs of the government, and as said by the court, supra, the railroads not only derived their existence, but their powers, their functions, their duties, and a large part of their resources from the acts incorporating them, and by virtue thereof sustain important relations to the government. And this, I think, will be found to be characteristic of most federal corporations whose cases the Supreme Court has held to arise under a law of Congress solely by reason of the federal character of the acts creating them. A notable exception is Knights of Pythias v. Kalinski, hereafter referred to. But in the case of these Indian Territory corporations there is nothing to give them any national character or function unless it be the simple fact that their incorporation is under an act of Congress, and as suggested by Chief Justice Marshall, in the Bank Case, where it is simply an act of incorporation, it may well be questioned whether this alone gives the creatures of the act the national character necessary to entitle them to remove their causes to the federal courts. Aside from the fact

that they are created under an act of Congress, there is nothing which distinguishes them from ordinary domestic corporations of the state or an organized territory. The operation of the act was confined to Indian Territory. The domicile of the corporation organized under it was to be Indian Territory, and not elsewhere. The purpose of their organization was for the transaction of business of an entirely local character, having no more relation, necessarily, to national governmental affairs than a private business of any individual resident of the Indian Territory, and, in fact, the sole purpose of the act was to give to corporations the right to engage locally in the Indian Territory in certain kinds of business, the same as individuals. As said by Justice Field in the Kansas Pacific Case, supra:

"A private corporation is, in fact, but an association of individuals united for a lawful purpose and permitted to use a common name in their business, and to have a change of members without dissolution. * * * The grant of incorporation is to bestow the character and properties of individuality on a collective and changing body of men."

A corporation therefore is entirely a creature of legislation. Congress saw fit to permit their creation in Indian Territory. Not having provided for a local Legislature, it provided by direct legislation for their existence. But their character and sphere of operation was in no sense different in essential respects from that of corporations created under the laws of Oklahoma Territory.

The case of Knights of Pythias v. Kalinski, 163 U. S. 289, 16 Sup. Ct. 1047, 41 L. Ed. 163, was an action begun by the plaintiff in a state court of Louisiana on a policy of life insurance issued by the defendant upon her husband's life. The defendant is a benevolent organization, having an insurance feature, domiciled in Washington, D. C., organized under a general act of Congress, and the cause was removed to the Circuit Court of the United States for the Eastern District of Louisiana on the theory that it was a federal corporation, and that the cause was therefore one arising under the laws of the United States. It does not appear that the jurisdiction of the federal court was questioned, and the Supreme Court assumes jurisdiction without comment, and passes upon the merits of the case, treating the defendant as a federal corporation. An examination of Act Cong. May 5, 1870, c. 80, 16 Stat. 98, under which the order of Knights of Pythias was organized, shows that it is a general incorporation act, providing for the organization of charitable, benevolent, business and railroad corporations within the District of Columbia. In this respect the act resembled the Indian Territory corporation act now being considered. The authority of Congress to enact this general incorporation law of the district is found in that clause of section 8 of article 1 of the federal Constitution, reading:

"To exercise exclusive legislation in all cases whatsoever over such district (not exceeding ten miles square), as * * * may become the seat of government of the United States."

It is observed from this constitutional provision that by it the several states relinquished any rights of government any of them might have over any ten miles square of territory which might at any time in

the future become the site of the federal government, and gave to Congress exclusive control thereof. This control is not, as in the territories, organized or unorganized, only temporary and with a view of ultimate statehood, but in the nature of things is perpetual, and shall exist so long as the government exists under the Constitution. In the Kalinski Case the act of incorporation was not only a congressional act, but at the time the suit was instituted and tried this exclusive congressional control still existed. No change had taken place, as in the case at bar, whereby the congressional authority to so legislate had been by Congress itself granted to the local state government.

On the other hand, as we have seen from the Mormon Church Case, supra, the power of Congress to enact the law in question relating to corporations in Indian Territory arose from the power to acquire territory, and the authority given by the Constitution (art. 1, § 8) to make all "needful rules and regulations" respecting the territory belonging to the United States. All such laws in the nature of "needful rules and regulations," so far as they relate to territories, organized and unorganized, are of necessity to be of only temporary application, and in each instance have served their purpose when the particular territory to which they apply becomes a state. For several years before the date of this Indian Territory incorporation act, Congress had been enacting laws looking to ultimate statehood, and this act was manifestly passed by Congress for the purpose only of providing a means of incorporation until statehood, just as a territorial Legislature in an organized territory might do pending statehood. By the enabling act subsequently passed, Congress has now provided for a state, and has thereby relinquished its right to create or control corporations local to the state.

In my opinion there is no fundamental difference between a law passed by a territorial Legislature, pursuant to authority delegated to it by Congress, and a law of a similar character, local to a territory, whether organized or unorganized, which Congress, in the absence of a territorial Legislature, directly enacts. They are each the result of the exercise by Congress of its power to make "needful rules and regulations" for the territory of the United States, exerted in the one instance indirectly, in the other directly. In the Pridgeon Case Congress extends a law of Nebraska over Oklahoma Territory for a local purpose. In this case Congress extends a law of Arkansas over Indian Territory for a local purpose. The latter was no more a general law of the United States than was the former, and was not in my judgment intended by Congress to be different in effect from the similar local incorporation act passed by the Legislature of Oklahoma Territory intrusted by it with the power to so legislate for that territory. While the act providing for corporations in Indian Territory was a direct act of Congress, and emanating as it did from the national Legislature was a law of the United States, as were all the statutory provisions adopted from Arkansas in force in Indian Territory, they were intended by Congress to comprise only a local system of laws for the government of the unorganized territory until such time as state-

hood should be granted, it being manifest from other contemporaneous congressional legislation which must also be considered that ultimate statehood was at all times contemplated. So that, as in the Pridgeon case, supra, a direct act of Congress adopting certain Nebraska criminal laws was not given the effect of a law of the United States, the violation of which was cognizable on the federal side of the court, but rather considered as a territorial law only, so also must the laws adopted from Arkansas for the local government of Indian Territory be considered as territorial laws, rather than as laws of the United States in the sense that being involved in any way in a case filed now, after statehood, they may constitute it a case "arising under the laws of the United States." It must be borne in mind that the act of Congress under which these Indian Territory corporations were created had served its purpose when the Indian Territory became a state, and, like other laws put in force in Indian Territory by Congress, has been by the force of the enabling act and statehood superseded by state laws. I cannot escape the conclusion that Congress intended that these incorporation laws of Arkansas extended over Indian Territory should serve identically the same purpose as to Indian Territory that the territorial incorporation laws of Oklahoma Territory served in that territory, and that Congress intended that, after the state of Oklahoma should be admitted into the Union, the corporations of Oklahoma Territory and of Indian Territory should have exactly the same status so far as the jurisdiction of the federal court is concerned, and that there is no more reason or authority for holding that a case now filed since statehood may be removed to the federal court solely because the defendant is a corporation originally organized under the laws in force in Indian Territory than there is for removing a case solely because the defendant is a corporation originally organized under the laws of Oklahoma Territory, and it is settled by the authorities heretofore cited that in the latter case a removal may not be had.

The motion to remand will, therefore, be sustained, and the cause remanded to the state court.