UNITED STATES of America,
Plaintiff-Appellee,

v.

Marco Alfonso RAMIREZ,
Defendant-Appellant.

No. 75–1395.

United States Court of Appeals,
Ninth Circuit.

Sept. 16, 1976.

On Rehearing July 5, 1977.

Frank J. Ragen, Deputy Federal Defender, San Diego, Cal., submitted on briefs for defendant-appellant.

Marco Alfonso Ramirez, c/o Frank J. Ragen, Deputy Federal Defender, San Diego, Cal., pro se.

Douglas G. Hendricks, Asst. U. S. Atty., San Diego, Cal., on the brief, Harry D. Steward, U. S. Atty., James W. Meyers, Asst. U. S. Atty., San Diego, Cal., argued, Stephen V. Petix, Asst. U. S. Atty., San Diego, Cal., on petition for rehearing, for plainitff-appellee.

Before CHAMBERS, ELY and HUF-STEDLER, Circuit Judges.

HUFSTEDLER, Circuit Judge:

Ramirez' appeal presents this important constitutional question: Does the Fifth Amendment require that a prosecution for a misdemeanor be initiated by indictment when the defendant can be sentenced under the Federal Youth Corrections Act (18 U.S.C. § 5010(b))? We hold that a defendant who is potentially subject to the extended confinement prescribed by the Youth Corrections Act is thus subject to

"infamous punishment" for which an indictment is required by the Fifth Amendment.

Ramirez was charged, by information, with possession of a controlled substance in violation of 21 U.S.C. § 844. He was found guilty and placed on probation. His probation was revoked after he admitted violating the conditions of the probationary order, and he was sentenced to an indeterminate term under section 5010(b) of the Youth Corrections Act ("YCA"). The YCA provides that the Youth Division of the Board of Parole may conditionally release a section 5010(b) youth offender at any time, that the Division must conditionally release him within four years of the date of conviction, and that it must unconditionally release him within six years of the conviction date.[1] (18 U.S.C. § 5017(a), (c).) Thus, Ramirez may be confined for as long as six years. The maximum penalty authorized for adult offenders[2] of section 844 is one year imprisonment and a $5,000 fine, a penalty which makes the offense a misdemeanor. (18 U.S.C. §§ 2, 844.) Ramirez' sole contention on appeal is that the conviction is invalid because his prosecution was initiated by an information rather than an indictment, are required by the Fifth Amendment.

The indictment clause of the Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." In *Ex Parte Wilson* (1885) 114 U.S. 417, 5 S.Ct. 935, 29 L.Ed. 89, the Supreme Court established two fundamental propositions concerning the scope of the indictment clause. First, the Court decided that "whether a man shall be put upon his trial for crime without . . . [an] indictment . . . depends upon the consequences to himself if he shall be found guilty." *Id.* at 423, 5 S.Ct. at 938. Relying on the clause's reference to the punishment of death and on early formulations of the amendment, the Court held that an indictment is required whenever an accused may be subjected to an "infamous punishment" if convicted. *Id.* at 423–26, 5 S.Ct. 935. Although *Wilson* left open the possibility that the indictment clause might "include also crimes infamous in their nature, independently of the punishment affixed to them" *id.* at 423–24, 5 S.Ct. at 938, the applicability of the clause has depended upon the punishment to which a defendant might be subjected upon conviction. Second, *Wilson* held that prosecution must be initiated by indictment when the sentencing court is authorized to impose an infamous punishment, regardless of whether the punishment actually imposed is an infamous one. *Id.* at 426, 5 S.Ct. 935.

Our quest for the meaning of "infamous punishment" requires a journey through the history of federal penology and of the development of penal institutions from colonial times to the present. Our course is charted by *Ex Parte Wilson, supra, Mackin v. United States* (1886) 117 U.S. 348, 6 S.Ct. 777, 29 L.Ed. 909, and *United States v. Moreland* (1922) 258 U.S. 433, 42 S.Ct. 368, 66 L.Ed. 700. In *Wilson* the Court held that

1. Youth offenders on conditional release are supervised by probation officers, supervisory agents appointed by the Attorney General, or voluntary supervisory agents approved by the Youth Division of the Board of Parole. (18 U.S.C. § 5019.) If the Youth Division determines during the period of conditional release that the "youth offender will be benefitted by further treatment," any member of the Division may direct his return to custody. After the youth appears before the Division or a member, "[t]he division may then or at its discretion revoke the order of conditional release." (18 U.S.C. § 5020.)

Public Law 94–233 (Mar. 15, 1976), 90 Stat. 219, enacted after the trial in *Ramirez* and thus not relevant here, effected a number of changes in the federal system of parole as applied to youth offenders.

2. The YCA initially applied only to defendants under the age of 22 years at the time of conviction. (18 U.S.C. § 5006(e).) In 1953, Congress granted the district courts the option of sentencing "young adult offenders" under the YCA if the offender was less than 26 years old at the time of conviction. (18 U.S.C. § 4209.) Both youth offenders and young adult offenders can, in the discretion of the sentencing judge, be sentenced under the adult penalty provisions. (*See Dorszynski v. United States* (1974) 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855.)

imprisonment at hard labor was an infamous punishment requiring an antecedent indictment. *Mackin* held that "imprisonment in a State prison or penitentiary with or without hard labor, is an infamous punishment." 117 U.S. at 352, 6 S.Ct. at 779. In *Moreland*, the Court clarified the two prior decisions and held that imprisonment at hard labor in any institution constitutes infamous punishment. Despite the *Wilson* Court's observation that the catalogue of infamous punishments "may be affected by the changes of public opinion from one age to another" 114 U.S. at 427, 5 S.Ct. at 940, and the substantial changes in penal institutions and penology that have occurred in the last 50 years, the infamous punishment concept has not been reexamined by the Supreme Court since *Moreland* was decided in 1922.[3]

In recent years, courts in three Circuits have grappled with the problem whether the YCA sentencing option requires that prosecution of youthful misdemeanants be initiated by indictment. A Colorado district court and the District of Columbia Circuit Court of Appeals reached opposite conclusions because they had opposing views about the susceptibility of YCA misdemeanants to penitentiary confinement. (*Compare Harvin v. United States* (1971), 144 U.S.App.D.C. 199, 445 F.2d 675, 677–82, 686–90 (*en banc*), *cert. denied*, 404 U.S. 943, 92 S.Ct. 292, 30 L.Ed.2d 257 (indictment not required) *with United States v. Reef* (D.Colo.1967) 268 F.Supp. 1015 (indictment required), *and Harvin v. United States, supra*, at 692–98 (dissenting opinion of Tamm, J.) (same).) In *United States v. Neve* (W.D. Wis.) 357 F.Supp. 1, *aff'd*, (7th Cir. 1974) 492 F.2d 465, the district and appellate courts found it unnecessary to resolve the question of penitentiary confinement and held instead that a potential penalty of forced confinement in any institution for as long as six years is adequate to trigger the constitutional right to an indictment. (*See also Harvin v. United States, supra*, at 698–701 (dissenting opinion of Tamm, J.).) We agree with the approach of the *Neve* courts.

## I. Background of the Supreme Court's Indictment Cases.

Colonial Americans were familiar with a wide range of punishments that had been used by the mother country and adopted by the colonies. In the early colonial period, imprisonment was usually an "intermediate step in the punishment process"; the convicted criminal was temporarily confined while awaiting punishment and, with the exception of those who suffered capital punishment, he was released after the penalty had been executed. (R. Goldfarb & L. Singer, After Conviction 20–21 (1973); H. Barnes, The Story of Punishment 56, 114 (2d ed. 1972); W. Goldberg, Twentieth Century Corrections VIII–16 (rev.ed.1970).) Among the punishments inflicted were death, flogging, mutilation, branding, stocks, pillory, bilboes, and ducking stool. (A. Earle, Curious Punishments of Bygone Days (1896); H. Barnes & N. Teeters, New Horizons in Criminology, 290–93 (3d ed. 1959); Thompson, Early Corporal Punishments, 6 Ill.L.Q. 37 (1923).) In many, if not most instances, the penalty was either publicly inflicted, or it altered the offender's appearance so that his criminal status was evident. It was not until the late eighteenth and early nineteenth centuries that the new states supplemented or replaced these forms of punishment with imprisonment and imprisonment at hard labor.[4]

---

3. In *Duke v. United States* (1937) 301 U.S. 492, 57 S.Ct. 835, 81 L.Ed. 1243, the Court considered whether the statute creating the class of petty offenses implied a requirement that misdemeanors be prosecuted by indictment. The certified question before the Court and the holding of *Duke* were expressly limited to misdemeanors "for which no infamous punishment is prescribed." *Id.* at 493, 495, 57 S.Ct. at 835. The Court construed the statute not to require misdemeanor indictments.

4. The replacement of corporal penalties with imprisonment was initiated in the Quaker colony of Pennsylvania. The Great Law of 1682 included the first Quaker criminal code, which prescribed imprisonment at hard labor for most of the previously capital or corporal crimes. After William Penn's death in 1718, the Quaker reforms were displaced by the Anglican Code which created thirteen capital offenses and revived the penalties of whipping, branding, and mutilation for lesser crimes. After the Revolu-

The indictment clause, and its counterparts in the state constitutions, was initially directed to this array of punishments. The two states, Massachusetts and New Hampshire, which recommended that the Constitution be amended to include an indictment requirement, sought that procedural protection for an accused who "may incur an infamous punishment, or loss of life." (1 Elliot's Debates 323, 326 (2d ed. 1907).) [5] When Madison introduced his amendments to the House of Representatives in 1789, he rephrased the states' proposals, apparently to reflect his eighteenth century conception of what constituted an infamous punishment:

"in all crimes punishable with loss of life or member, presentment or indictment by a grand jury shall be an essential preliminary." [6] (1 Annals of Congress 435 (1789).)

And Nathan Dane, discussing the Massachusetts constitution in 1823, described the distinction between infamous and noninfamous punishments as follows:

"Punishments, clearly *infamous*, are death, gallows, pillory, branding, whipping, confinement to hard labour, and cropping. Blackstone considers stocks and house of correction, *ignominious*, as well as whipping and pillory. But in some books, imprisonment; stocks, a species of imprisonment; house of correction, a species of confinement, and fines, and *a fortiori*, binding to the peace, and good behaviour, are not *infamous*; and

the latter opinion our law adopts, in its practice on the constitution." (2 Dane's Abridgements 569–70 (1823).)

Despite the continued use, in the early nineteenth century, of the harsh corporal punishments in some states, the range of penalties employed by the new federal government was more restricted. In the Crimes Act of 1790, the First Congress provided for the penalties of death, public whipping, standing in pillory, imprisonment, fines, reparations, disqualification to hold office, and disqualification to give testimony in the courts of the United States. (Act of April 30, 1790, ch. 9, 1 Stat. 112.) Imprisonment and fines were the most common non-capital punishments and were favored in subsequent criminal enactments of the late eighteenth century. (*E. g.*, Act of Feb. 12, 1793, ch. 7, 1 Stat. 302; Act of June 5, 1794, ch. 50, 1 Stat. 381; Act of June 14, 1797, ch. 1, 1 Stat. 520; Act of July 14, 1798, ch. 74, 1 Stat. 596; Act of Jan. 30, 1799, ch. 1, 1 Stat. 613.) Hard labor was first added to the federal arsenal of penalties in 1798, when the Fifth Congress provided that persons convicted of counterfeiting national currency "shall be sentenced to be imprisoned and kept at hard labour for a period of not less than three years, nor more than ten years, or shall be imprisoned not exceeding ten years, and fined not exceeding five thousand dollars." (Act of June 27, 1798, ch. 61, 1 Stat. 573–74.)

As the catalogue of federal crimes increased, imprisonment and imprisonment at

---

tionary War, Pennsylvania again led the reform movement. In 1786 imprisonment at hard labor on the public streets supplanted the corporal punishments and by 1791, first degree murder was the only capital crime and the only serious crime not punished by imprisonment at hard labor. Pennsylvania established the first penitentiary in 1790. (Barnes & Teeters, *supra*, at 326–27, 335–37.) The other new states, especially those in the south, were slower to eliminate the corporal penalties, but by 1835 confinement and hard labor were the most common punishments for all but the relatively few capital crimes in most states. (B. McKelvey, American Prisons, A Study in American Social History Prior to 1915, 7, 16 (1936).)

**5.** The New York convention declared that "a presentment or indictment by a grand jury ought to be observed as a necessary prelimi-

nary to the trial of all crimes cognizable by the judiciary of the United States," but the delegates did not include an indictment requirement in their recommended amendments. (1 Elliot's Debates, *supra*, 328.)

**6.** The Amendment was reported out of committee, with no explanation, in substantially the same form as was ratified by the states. (1 Annals of Congress 760 (1789).) The only discussion of the clause was initiated by Representative Burke of South Carolina. He sought to amend it to read, "that no criminal prosecution should be had by way of information." (*Id.* at 756.) His proposal was defeated. (*Id.* at 760.)

hard labor dominated the non-capital punishments prescribed in the criminal code. In 1839 Congress abolished the penalties of whipping and standing in pillory (Act of Feb. 28, 1839, ch. 36, § 5, 5 Stat. 321–22, *codified in* 18 U.S.C. § 3564), and by the time the laws of the United States were compiled in the Revised Statutes, death, the two forms of imprisonment, pecuniary penalties, and, in a few instances, disqualification to hold office or to testify comprised the range of federal criminal penalties. (*See generally* Rev.Stat. §§ 5323–5550 (2d ed. 1878).)

Although Congress settled rather quickly on imprisonment and hard labor as the primary penalties for serious, non-capital offenses, it moved much more slowly in providing institutions in which federal prisoners could be confined. The First Congress recommended, by resolution, that the states pass laws providing for the keeping of federal prisoners at the rate of fifty cents per month (Sept. 23, 1789, 1 Stat. 96), and authorized the United States Marshals "To hire a convenient place to serve as a temporary jail" when a state did not comply with the recommendation. (March 3, 1791, 1 Stat. 225; March 3, 1821, 3 Stat. 646 (same authorization when state withdraws use of jail for federal prisoners).) The practice of sending federal convicts to state institutions continued until the beginning of the twentieth century.

Initially, Congress made no provision for differentiating among the types of institutions in which federal prisoners could be confined. In 1825, however, it both provided for and limited the discretion of the sentencing judge to designate the institution to which a prisoner could be sent. The court was authorized to order a sentence "to be executed in any state prison, or penitentiary within the district"[7] when the convict was "sentenced to imprisonment

and confinement to hard labour." (Act of March 3, 1825, ch. 65, § 15, 4 Stat. 115, 118.)

In 1865 Congress broadened the liability of federal convicts to penitentiary confinement. It provided that if a defendant were "sentenced to imprisonment for a period longer than one year" the court could order that execution be "in any state prison or penitentiary within the district or state." (Act of March 3, 1865, ch. 86, § 3, 13 Stat. 500.) Thus, after 1865 the federal courts were empowered to order imprisonment in a state penitentiary when the sentence was greater than one year or when it included hard labor. Beginning in 1864, if no institution was available within the state, the Attorney General could designate a prison in another state. (Act of May 12, 1864, ch. 85, 13 Stat. 74.)[8] Transfers from one institution to another, in the discretion of the Attorney General, were authorized after 1876, but only to assure adequate custody of the prisoner or, upon application of the prisoner, to prevent cruel or improper treatment and to preserve the convict's health. (Act of July 12, 1876, ch. 183, 19 Stat. 88.)

Our brief summary of the development of the federal criminal law provides the context in which the *Wilson* and *Mackin* Courts construed the indictment clause. Imprisonment and hard labor had replaced the corporal punishments as the penalty for serious crimes. These two infamous punishments were separate sentencing options available to the trial judge. Hard labor was a distinct penalty expressly authorized for specific crimes and penitentiary confinement, while not included in the penalty clauses of particular offenses, was ordered by the sentencing judge as part of the punishment. There were no national prisons; nor was there an integrated system of state institutions. Federal convicts sentenced to a penitentiary were confined in whatever facility the state had provided or,

7. In 1856 Congress modified this provision to accommodate the division of judicial districts within a state. The federal courts were then given the power to sentence "to the penitentiary within the State, though it be out of the judicial district in which the conviction is had." (Act of March 28, 1856, ch. 9, 11 Stat. 2.)

8. The Act of 1864 granted this authority to the Secretary of the Interior. In 1872 the powers and duties relating to federal prisoners were transferred to the Department of Justice. (Act of March 5, 1872, ch. 30, § 1, 17 Stat. 35.)

if there was no prison in the state of conviction, in the institution of a neighboring state. Congress made no provision for the classification of prisoners or for tailoring the conditions of confinement to the rehabilitative needs of individual convicts.

Within this nineteenth century system of sentencing and punishment, the infamous consequences to the convict himself were included in the sentence and the statutes authorized the court to award an infamous punishment. An accused's exposure upon conviction to a sentence of penitentiary confinement or hard labor triggered his constitutional right to prosecution by indictment. (*Wilson, supra,* 114 U.S. at 423, 426, 5 S.Ct. 935.)

II. *Statutory Changes Since Wilson and Mackin.*

Since *Wilson* and *Mackin,* substantial changes in sentencing procedures and in the prison system have altered the impact of those decisions. These alterations either directly resulted from or were made possible by the development of a federal prison system. As an increasing percentage of federal prisoners were confined in federal, rather than state institutions, the two noncapital infamous punishments lost their character

as punishments imposed by a sentencing court and became part of the disciplinary regimen and rehabilitative program established by the Attorney General and the newly created Bureau of Prisons.

Although the federal government operated penal institutions in the District of Columbia (Act of May 20, 1826, ch. 81, 4 Stat. 178; Act of March 3, 1829, ch. 65, 4 Stat. 365), in the territories (Act of Jan. 22, 1867, ch. 9, 14 Stat. 377; Act of Jan. 10, 1871, ch. 15, 16 Stat. 398), and for military prisoners (Act of March 3, 1873, ch. 249, 17 Stat. 582), Congress made no attempt to establish a federal prison system until 1891.[9] In that year the Attorney General and the Secretary of the Interior were authorized to purchase three sites and to build institutions "for the confinement of all persons convicted of any [federal] crime whose term of imprisonment is one year or more at hard labor." (Act of March 3, 1891, ch. 529, § 1, 26 Stat. 839.) Delays in appropriating the funds and constructing the facilities postponed actual use of the federal prisons until after the turn of the century; but the three institutions authorized by Congress eventually became the penitentiaries of Leavenworth, Kansas; Atlanta, Georgia; and McNeil Island, Washington.[10] From this

9. The prison in the District of Columbia was not in continuous operation throughout the nineteenth century. In 1863, Congress provided that convicts of a penitentiary offense in the District should be sent to the state prisons, subject to a retransfer when a suitable penitentiary was erected in the capital city, (Act of Jan. 16, 1863, ch. 10, §§ 1, 6, 12 Stat. 635.) As late as 1887, penitentiary sentences of the District's convicts were being served in the penitentiary at Albany, N. Y. (Annual Report of the Attorney General 257 (1887). The District of Columbia also contained a jail facility. (Act of Feb. 29, 1864, ch. 16, 13 Stat. 12.)

Territorial prisons "were used largely for the incarceration of persons offending local regulations and were usually transferred to the new State at the time it was granted autonomy." (J. Bennett, The Federal Penal and Correctional Problem (1928), *reprinted in Hearings on the Federal Prison System Before the Subcomm. on National Penitentiaries of the Sen. Comm. on the Judiciary,,* 88th Cong., 2d Sess. 108, 129 (1964).) In some instances, the territorial prisons were operated by the territorial rather than the national government, although the United

States retained ownership of the facilities. (Act of Jan. 24, 1873, ch. 63, 17 Stat. 418.)

Congressional consideration of a system of federal prisons began as early as 1825 when the House passed a resolution that the Committee of the Judiciary should inquire into the expediency of establishing national penitentiaries where the federal sentences of imprisonment and hard labor might be served. (1 Register of Debates in Congress, 18th Cong., 2d Sess., 151–52 (1825).)

10. The first step toward a national prison was taken in 1895 when Congress transferred the military prison at Fort Leavenworth to the Department of Justice. (Act of March 2, 1895, ch. 189, 28 Stat. 910, 957.) The next year Congress authorized construction of a new facility at that location and construction by convicts began shortly thereafter. (Act of June 10, 1896, ch. 400, 29 Stat. 380.) At the end of the nineteenth and the beginning of the twentieth century, Congress appropriated funds for the Atlanta penitentiary, which was first occupied in 1902. (J. Bennett, *supra,* at 132.) The McNeil Island facility was initially a territorial

core group of three prisons, the federal system has grown to more than 35 institutions, including penitentiaries, correctional institutions, prison camps, reformatories, detention centers, and a medical center. (*See* Bureau of Prisons Policy Statement No. 7300.13E, Attachments A–LL, (June 16, 1975).) As new facilities were built and the old ones enlarged, the percentage of federal prisoners confined in state institutions declined.[11]

While the federal prison system was developing, Congress was also overhauling sentencing and punishment. As part of its revision and recodification of the penal code in 1909, Congress eliminated hard labor from the punishment clause of each section. The Joint Committee on the Revision of the Laws explained the reason for removing hard labor from the statutory punishment options:

"The provisions in various sections imposing hard labor as an added punishment to imprisonment have been found in actual practice to be difficult of application because of the fact that the United States Government has no adequate prisons under its own control for the incarceration of all prisoners under sentence, but is obliged to use for this purpose such prisons of the various States as may be designated by the Attorney General and permitted by the State authorities. The regulation of prison discipline in these various State institutions is necessarily under the direction and control of the respective States, and different regulations respecting hard labor exist in the different States.

"We have therefore omitted from the penalties imposed in the various sections the distinction heretofore existing which

in some cases added to imprisonment the condition of hard labor and in other instances made no such provision.

"Under existing law a convict sentenced to be confined in a State institution is subject to the regulation of hard labor as therein imposed as a part of the prison discipline . . .; and inasmuch as all Federal prisons have this disciplinary provision, a convict wherever sent for imprisonment will, under the recommended change, be subject to hard labor as a part of the prison discipline instead of a part of the sentence. The same result is therefore obtained and the existing incongruity overcome." (S.Rep. No.10, Pt. I, 60th Cong., 1st Sess. 13 (1908).)

Despite the recognition that hard labor had become primarily a disciplinary measure used in nearly all institutions regardless of the sentence, instead of a punishment for specific crimes, Congress preserved the hard labor sentencing option:

"The omission of the words 'hard labor' from the provisions prescribing the punishment in the various sections of this Act, shall not be construed as depriving the court of the power to impose hard labor as a part of the punishment, in any case where such power now exists." (Act of March 4, 1909, ch. 321, § 338, 35 Stat. 1088, 1153, *codified in* 18 U.S.C. § 572 (1940 ed.).)

The Committee Report clarified the import of the section: "This section . . . is inserted so as to avoid a possible construction that the omission of the words 'hard labor' from the various sections of this act indicated an intention on the part of Congress that 'hard labor' should no longer

prison. When the new state of Washington declined to take over the prison, the federal government constructed new cell blocks and converted it to a national penitentiary. Initial construction was completed and the first warden appointed in 1909. (*Id.* at 133–35.)

11. During the transition period at the beginning of the twentieth century, the Attorney General's Reports give the following statistics for the location of federal convicts:

| | 1901[a] | 1908[b] | 1913[c] |
|---|---|---|---|
| Federal Institutions | 903 | 1,706 | 2,467 |
| State Institutions * | 2,127 | 968 | 470 |
| Total | 3,030 | 2,674 | 2,937 |

* excluding county jails

[a]. Report of the Attorney General 28 (1901)

[b]. Report of the Attorney General 50 (1908)

[c]. Report of the Attorney General 52 (1913)

form a part of the punishment which might be imposed." (S.Rep.No.10, Pt. I, 60th Cong., 1st Sess. 26 (1908).)

For nearly four decades, hard labor retained its status as an unstated, and seldom used, sentencing option.[12] In the 1948 revision and recodification of Title 18, however, the section was finally repealed. (Act of June 25, 1948, ch. 645, § 21, 62 Stat. 683, 862–63.) Although the Reviser's Notes do not directly discuss the repeal, the intended effect is evident in the discussion of new section 1, which classified crimes as felonies, misdemeanors, or petty offenses according to the penalty authorized. The prior formulation of the classification section had stipulated that petty offenses were those punishable by six months confinement without hard labor. (18 U.S.C. § 541 (1940 ed.).) Congress omitted the "hard labor" provision

"to conform to policy followed by codifiers of 1909 Criminal Code, and because such a provision is obsolete in view of section 4082 of this title, authorizing commitment to the custody of the Attorney General and sections 4001 and 4121 et seq. of this title, making all Federal prisoners subject to whatever discipline may be prescribed in the prisons to which they are committed."

(H.R.Rep.No.304, 80th Cong., 1st Sess. A4 (1976).)

Similarly the words "with or without hard labor" were omitted from section 753c [13] of the 1940 Code because they were "unnecessary in view of omission of 'hard labor' as part of the punishment." (*Id.* at A178.)

As explained in the Reviser's Notes, the elimination of hard labor as a form of punishment prescribed by the sentencing judge did not constitute a prohibition of its use in the federal penal system. The Attorney General could, in his discretion, use hard labor as a means of discipline or as a technique of rehabilitation. Under the current statutory structure, the Attorney General is empowered to "provide for [the] proper government, discipline, treatment, care, rehabilitation, and reformation" of federal prisoners (18 U.S.C. § 4001.) Moreover, Chapter 307 of Title 18 specifically authorizes the establishment of industries within federal institutions (18 U.S.C. §§ 4121–24, 4126–28), and grants the Attorney General power to "make available . . . the services of United States prisoners . . for constructing or repairing . . . public ways or works." (*Id.* § 4125.) [14]

---

**12.** The confusion between hard labor as discipline and hard labor as a punishment prescribed by the sentencing judge preceded the 1909 revisions of the criminal law. In *Ex Parte Karstendick* (1876) 93 U.S. 396, 23 L.Ed. 889, the Supreme Court upheld a sentence to a state prison in which hard labor was a disciplinary measure, even though the statute creating the crime did not provide for a hard labor penalty. Under an 1834 act (Act of June 30, 1834, ch. 163, 4 Stat. 739), federal prisoners in state prisons were subject to the discipline and control measures of that institution. Construing this act in conjunction with the different penalty provisions in the federal criminal law, the Court concluded that when hard labor is included in the penalty clause, its use is imperative, but when the statute authorizes only imprisonment, the court may order confinement in an institution "where labor is exacted as part of the discipline and treatment of the institution." (93 U.S. at 399, 23 L.Ed. 889. *See also United States v. Pridgeon* (1894) 153 U.S. 48, 14 S.Ct. 746, 38 L.Ed. 631.)

After the 1909 revisions, the lower courts construed § 338 as permitting, in the discretion of the sentencing court, a sentence to hard labor or to an institution in which hard labor is imposed as discipline. (*E. g., Linningan v. Morgan* (8th Cir. 1917) 241 F. 645, 648–49; *Rogers v. Desportes* (4th Cir. 1920) 268 F. 308, 315–16.)

**13.** Section 753c authorized the Attorney General to erect detention facilities in areas where no suitable facility existed "for the confinement of persons convicted of offenses against the United States and sentenced to imprisonment, with or without hard labor" or other persons subject to confinement. (18 U.S.C. § 753c (1940 ed.).)

**14.** There can be little doubt that the labor authorized by Chapter 307 qualifies as "hard labor." The 1909 and 1948 revisions of the criminal code did not suggest that the omission of the penalty constituted a prohibition of the practice. The 1909 revision was a simple recognition that hard labor was used in state and federal prisons whether or not it was part of the sentence. The 1948 revision, as explicated in the Reviser's Notes, *supra*, removes the remaining references to the punishment of hard labor because its use was no longer determined by the sentencing judge, but was within the powers granted to the Attorney General.

This power is not limited to specific institutions or institutional types.

The exposure of all federal prisoners, youth or adult, to the imposition of hard labor at the discretion of the Attorney General could, under *Wilson* and *Moreland*, be construed to require an indictment in every criminal case.[15] That the indictment cases seem to require this result illustrates the need for reconsideration of those cases. The indictment clause, as interpreted in *Wilson*, is directed to infamous punishments, yet since 1948, the district courts have not been permitted to impose the punishment of hard labor. Hard labor is not a sentencing option and is not associated with particular crimes; rather, it is available to prison administrators as one part of the "individualized system of discipline, care, and treatment" that Congress has sought to provide inmates in an integrated federal prison system. (18 U.S.C. § 4081.) Whether or not a convict is subjected to a regimen that could be classified as hard labor depends, not on the offense which gave rise to his conviction, but on the training, disciplinary, or control needs of the individual, the facilities available in the institution, and the requirements for maintenance of order within federal prisons.

Penitentiary confinement, the other non-capital infamous punishment, has undergone a transformation nearly identical to that of the hard labor penalty. Through a series of enactments spanning 50 years, Congress has shifted the power to determine the institution of confinement from the sentencing judge to the Attorney General. In the 1891 act authorizing the construction of national prisons, the Attorney General was granted authority to designate in which of the three proposed federal prisons a convict sentenced to penitentiary imprisonment should be confined. (Act of March 3, 1891, ch. 529, § 9, 26 Stat. 839,

Although the Supreme Court has never undertaken a definition of "hard labor" as distinguished from mere "labor," the *Moreland* decision suggests that forced employment of the mildest sort is within the bounds of "hard labor." The District of Columbia workhouse, to which the defendant had been sentenced, employed its inmates in agricultural and industrial pursuits. As described by Justice Brandeis in dissent:

"The work is such as is ordinarily performed under favorable conditions on farms, in factories and in the mechanical trades; and it is not harder. The eight-hour work day prevails.

. . . . . .

The dominant purpose . . . is not punishment, but rehabilitation.

The compulsory labor is in a larger sense compulsory education." 258 U.S. at 444–45, 42 S.Ct. at 372.

There is no indication in the YCA that Chapter 307 does not apply to youth offenders. But even if Congress intended that the Chapter not be applicable to the YCA confinement, the Act's vague definition of the treatment afforded youth offenders seems also to authorize the technique of hard labor. (18 U.S.C. § 5006(g).) The YCA "is based on the principles and procedures developed under what is known as the Borstal system," (H.R.Rep.No.2979, 81st Cong., 2d Sess. 5 (1950) U.S.Code Cong. Serv.1950, pp. 3983, 3985) which relied on "an intensive program . . . of hard work and strict discipline." (*Id.* at 4, U.S.Code Cong. Serv. 1950, p. 3987.) *See generally* L. Fox, the English Prison and Borstal Systems 373–78 (1952).

15. The indictment clause problem created by the use of hard labor as a disciplinary or rehabilitative measure is not new. It was first created implicitly in *Ex Parte Karstendick* and the statutes there involved. (*See* note 12, *supra.*) The *Karstendick* Court held that when a statute required only imprisonment, it was within the discretion of the court to order execution of the sentence at an institution where hard labor was required. 95 U.S. at 399, 23 L.Ed. 889. Since the sentencing court's discretion was not limited to offenses involving imprisonment for more than one year, *Karstendick* seems to have made a prisoner's liability to hard labor depend on the administration of the individual state prisons and jails. Because the case was decided prior to *Wilson* and *Mackin*, the Court did not consider the impact of its decision on the indictment clause. After the indictment cases the Court decided *In Re Mills* (1890) 135 U.S. 263, 10 S.Ct. 762, 34 L.Ed. 107, and held that an offense carrying a penalty of penitentiary imprisonment is an offense punishable by imprisonment at hard labor if the institution requires hard labor of its prisoners. *Id.* at 266, 10 S.Ct. 762. When the question of disciplinary hard labor was squarely presented to two lower federal courts, both construed the state statute not to permit hard labor for federal prisoners when it was not included in the sentence. (*Falconi v. United States* (6th Cir. 1922) 280 F. 766; *United States v. Nelson* (E.D. N.Y.1918) 254 F. 889).)

840.) When Congress provided for the establishment of an industrial reformatory in 1925 for offenders under age 30 who were sentenced to imprisonment for more than one year, it stipulated that it was sufficient for the courts to sentence to imprisonment to a penitentiary without specifying the particular penitentiary or the reformatory. The Attorney General was to designate the specific institution. (Act of Jan. 7, 1925, ch. 32, § 1, 43 Stat. 724; see Act of May 12, 1930, ch. 237, 46 Stat. 265.) In 1930, this division of power as to institutional designation was clarified in the act creating the Bureau of Prisons:

"Hereafter all persons convicted of an offense against the United States shall be committed, for such terms of imprisonment and *to such types of institutions as the court may direct*, to the custody of the Attorney General of the United States or his authorized representative, who shall designate the places of confinement where the sentences of all such persons shall be served. The Attorney General may designate any available, suitable, and appropriate institutions . . . ." (Act of May 14, 1930, ch. 274, § 7, 46 Stat. 325, 326 (emphasis added).)

Thus, the sentencing court included the type of institution as part of the sentence, while the Attorney General determined which particular institution of that type should be used to carry out the sentence.

This arrangement survived for only a decade until Congress completely eliminated designation of an institution or institutional type from the sentencing procedure:

"Hereafter all persons convicted of an offense against the United States shall be committed, for such terms of imprisonment as the court may direct, to the custody of the Attorney General of the United States or his authorized representative, who shall designate the places of confinement where the sentences of all such persons shall be served." (Act of June 14, 1941, ch. 204, 55 Stat. 252.)

As the only limitation on the Attorney General's discretion to determine the institution of incarceration, Congress incorporated the provision that a sentence of less than one year could not be served in a penitentiary except with the defendant's consent. *(Id.)* These provisions are now codified in 18 U.S.C. §§ 4082-83.[16]

As in the case of hard labor, the removal of the sentencing judge's power to impose the infamous punishment of penitentiary confinement was not merely a change of form, but reflected Congress' view that the particular institution in which a convict was incarcerated was an important consideration in the rational administration of a federal penal system, rather than an element of punishment for the particular crime committed. The Senate Report on the 1941 act consists of a letter from then Attorney General Robert Jackson, which the Judiciary Committee states "is expository of this proposed legislation":

"The power to transfer prisoners from one institution to another is frequently exercised for a variety of reasons. Among the more important of these reasons is to assure defendant being confined in an institution of a type which is most suitable for his safe custody and rehabilitation. Another important reason is to prevent overcrowding of any one institution and to use the facilities of the entire Federal penal and correctional system to the best advantage. Such a course is in accord with the policy of the Congress, as declared in section 7 of the act of May 27, 1930 (46 Stat. 390; U.S.C., title 18, sec. 907).

. . . . .

16. In 1959 the Attorney General's power to order penitentiary confinement was expanded to include prisoners convicted of a crime punishable by imprisonment for more than one year even if the sentence was less than one year. (Act of Sept. 14, 1959, Pub.L. No. 86–256, 73 Stat. 518.) The Justice Department sought the amendment to cover convicts "who, because of long and serious criminal records, or attempted escape, or having been found in the institutions with contraband knives or other weapons, are not considered good risks for incarceration in institutions other than a maximum security penitentiary." (H.R.Rep.No.934, 86th Cong., 1st Sess. 2 (1959), U.S.Code Cong. & Admin.News 1959, pp. 2315, 2316.)

"To enable the Attorney General to determine the type of institution to which the prisoner is to be confined in the first instance may save expense to the Government in subsequent transfers." (S.Rep. No.369, 77th Cong., 1st Sess. 1–2 (1941).) The 1940 act to which Attorney General Jackson referred declared that it was the policy of Congress that federal institutions should be

"so planned and limited in size as to facilitate the development of an integrated Federal penal and correctional system which will assure the proper classification and segregation of Federal prisoners according to their character, the nature of the crime they have committed, their mental condition, and such other factors as should be taken into consideration in providing an individualized system of discipline, care, and treatment of the persons committed to such institutions." [17]

The congressional policy is, of course, that of classification, a technique used to provide individualized treatment and to reach the goal of rehabilitation. (*See generally* L. Orland, Justice, Punishment, Treatment, 218–40 (1973).)

Within an "integrated Federal penal and correctional system," confinement in any particular type of institution, as ordered by the Attorney General, is less an element of punishment than a means of using the varied facilities of the system to meet the custody, disciplinary, and rehabilitative needs of individual prisoners. The nature of the crime is but one consideration among the many that are relevant to institutional assignment.[18] Penitentiary confinement, controlled by the Attorney General and used in conjunction with a system of classification, has lost its character of infamous punishment and has been integrated into the rehabilitative and disciplinary programs of the federal prisons.

The changes in the manner and purposes for which hard labor and penitentiary confinement are now imposed on federal convicts raise the difficult question of whether the indictment cases are applicable to the present-day federal prison system in general and to confinement under the YCA in particular. Because our decision is grounded on the length of confinement, we do not decide this question. Until overruled or modified by the Supreme Court, the two infamous punishments recognized in *Wilson, Mackin,* and *Moreland* continue to determine the application of the indictment clause. Nevertheless, the growth of a federal prison system and the means by which the place and conditions of confinement are administratively determined highlight the importance of the length of confinement in judicial sentencing procedures.

### III. *Loss of Liberty as an Infamous Punishment.*

From the first time that it construed the indictment clause the Supreme Court has recognized that the provision is not static. *Wilson* explicitly acknowledged that "[w]hat punishments shall be considered as infamous may be affected by the changes of public opinion from one age to another," and suggested that two punishments (whip-

---

17. Although the 1930 act was directed only to two new institutions, the 1948 revisions rephrased the section so "as to make one policy for all institutions, thus clarifying the manifest intent of Congress." (H.R.Rep.No.304, 80th Cong., 1st Sess. A180 (1947).) The provision is now codified in 18 U.S.C. § 4081.

18. The Bureau of Prisons' implementation of the Attorney General's classification and transfer authority best demonstrates the relatively small importance of the crime committed in a determination of institutional assignment. The factors considered by the Bureau demonstrate an attempt to meet individual needs within certain institutional constraints in a manner that preserves the "overall integrity of [the]

classification system." (Bureau of Prisons Policy Statement 7300.13E at 2 (June 16, 1975).) Among the individual characteristics considered are age, sex, training needs, need for medical attention, special program needs (*e. g.,* drug abuse), criminal sophistication, proclivity to violence, prior record, length of sentence, time until release, release destination, disciplinary problems, poor institutional adjustment, and escape risk. The institutional constraints include institutional service area, security limitations, program resources, and population capacity and density. (*Id.* 11–12, Attachments A–LL.)

ping and stocks) previously considered moderate, "at the present day . . . might be thought [to be] infamous. . . ." 114 U.S. at 427–28, 5 S.Ct. at 940. The Court in *Mackin* approved of this temporal limitation on the definition of infamous punishments 117 U.S. at 351, 6 S.Ct. 777, and included it in its holding that "at the present day imprisonment in a . . . penitentiary . . . is an infamous punishment." (*Id.* at 352, 6 S.Ct. at 779, *see United States v. Moreland* (1922) 258 U.S. 433, 451, 42 S.Ct. 368, 66 L.Ed. 700 (Brandeis, J., dissenting).)

Ramirez contends that at the present day confinement for more than one year constitutes infamous punishment. We agree. Our discussion in Part II, supra, illustrates a system of punishment different from that considered by the *Wilson, Mackin* and *Moreland* Courts. The most severe non-capital punishment imposed today is the deprivation of liberty and the subjection of the convict to supervision and control by the Attorney General and prison authorities.

The paramount importance of the length of confinement in the federal system of criminal punishment is evident throughout the criminal code. In contrast to its failure to specify what treatment, rehabilitative, or disciplinary measures are to be used in federal prisons, Congress has enacted detailed guidelines for determining the actual term of a prisoner's confinement. Those provisions include a prescribed method of sentence computation and credit for time served prior to commencement of sentence (18 U.S.C. § 3568); a deduction for "good time" served (18 U.S.C. §§ 4161–66); and guidelines for release on parole prior to the expiration of the prisoner's term (18 U.S.C. §§ 4201–08).

More importantly, Congress' division of authority between the trial judge and the Attorney General reflects a system in which criminals are punished by depriving them of their liberty, not by the type of institution in which they are confined. With the abandonment of hard labor and penitentiary confinement as punishments for specific crimes, the control of the sentencing judge over the severity of the punishment is exercised through his determination of the period of time for which a convict may lose his freedom. Within statutory limits, the trial court can increase the penalty by stipulating the maximum possible term of confinement and by designating a minimum term which must be served prior to a prisoner's eligibility for parole. (18 U.S.C. §§ 3651–56.) The trial judge may not, however, designate the institution of confinement or require that any other punitive sanctions be imposed while the prisoner is confined. (*United States v. Janiec* (3rd Cir. 1974) 505 F.2d 983, 987, *cert. denied*, (1975) 420 U.S. 948, 95 S.Ct. 1332, 43 L.Ed.2d 427; *United States v. Myers* (9th Cir. 1972) 451 F.2d 402, 404; *Thogmartin v. Moseley* (D.Kan.1969) 313 F.Supp. 158, aff'd, (10th Cir.) 430 F.2d 1178, *cert. denied*, (1970) 400 U.S. 910, 91 S.Ct. 155, 27 L.Ed.2d 150. On the other hand, the Attorney General's control over the institution and conditions of confinement does not include the power to impose further punishment for the crime committed. His charge is to "provide for [the convict's] proper government, discipline, treatment, care, rehabilitation, and reformation." (18 U.S.C. § 4001.) To be sure, "discipline" encompasses punitive action as well as the maintenance of good order in the institution, but the punitive sanctions imposed by the Attorney General are not a result of the crime which brought the prisoner into the penal system. The Attorney General is not authorized to put a prisoner in solitary confinement, employ him, or transfer him to a penitentiary because the prisoner robbed a bank, stole a car, or violated the law in some other manner; his powers are directed to "providing an individualized system of discipline, care, and treatment" in an "integrated system." (18 U.S.C. § 4081.) That is, the Attorney General may establish a disciplinary regimen or take punitive action because of the needs of the institution and system of institutions, or because of a particular prisoner's poor response to the prison environment. He may not, however, punish individual prisoners for their crimes. Thus, before disciplinary sanctions may be imposed, prison authori-

ties must provide procedures in accord with the minimum requirements of due process in order to reach a "mutual accommodation between institutional needs and objectives and the . . . Constitution." (*Wolff v. McDonnell* (1974) 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, see Bureau of Prisons Policy Statement 7400–5D (July 7, 1975) (implementing *McDonnell*).)

The development of a system wherein the loss of liberty is the most severe non-capital punishment available to a sentencing judge reflects, we believe, "changes in public opinion from one age to another." Persons convicted are no longer deprived of their liberty so that they may be punished in prison; rather, they are punished by being deprived of their liberty. The punitive element connected with the crime, and the only element still controlled by the sentencing judge, is the loss of freedom for some period of time. Within this system punishments can be distinguished, for the purpose of applying the indictment clause, only in terms of the length of time during which a prisoner is deprived of his freedom. We therefore conclude that a criminal defendant who is subject to confinement for more than one year must be prosecuted by an indictment. Although not an inexorable result, the more-than-one-year formula has, since 1865, been the effective limit of the indictment clause as applied to imprisonment without hard labor. It also is the method used by Congress to distinguish between felonies and misdemeanors (18 U.S.C. § 1(1)), and is the formula used in the Federal Rules of Criminal Procedure (Fed. R.Crim.P. 7(a)).[19] (*See also* 18 U.S.C. § 4208(a).)

## IV. *The Federal Youth Corrections Act.*

Under the YCA appellant Ramirez can be confined for as long as six years. Unless there are special considerations relating to the YCA that permit a qualification of the indictment clause, he is constitutionally en-titled to an indictment. We see three possible reasons why the indictment clause might not be applicable to youthful misdemeanants, despite their potential six-year confinement: (1) successful implementation of the purposes of the YCA might be hindered by extending the clause to youthful misdemeanants; (2) youth offenders receive treatment in lieu of imprisonment; and (3) the crime involved is a misdemeanor which does not require an indictment in cases involving adult offenders.

Normally, the coverage of a constitutional provision is not determined by Congress' desire to reshape the system of criminal justice. The protections the Constitution affords to persons charged with crimes are limitations on congressional action, and are not compromised because Congress perceives a "better" method of administering the criminal process. Nevertheless, recent cases relating to juvenile delinquency proceedings suggest that the Supreme Court recognizes that constitutional provisions are to be interpreted by examining the extent to which the constitutional right is infringed and the extent to which a wooden application of the Constitution would destroy the legitimate goals of the legislation in question. (*See McKeiver v. Pennsylvania* (1971) 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647; *In Re Winship* (1970) 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368; *In Re Gault* (1967) 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527.) Although these cases involved the application of the due process clause, a constitutional provision well-suited to judicial "balancing," the preliminary procedural protection afforded by the indictment clause may also be susceptible to accommodation with the proceeding to which it is applied.

The YCA, however, presents no need for such an accommodation. Unlike juvenile delinquency proceedings, the process of convicting youthful offenders is clearly a criminal process. The YCA merely presents a

---

**19.** Rule 7(a) states that an "offense which may be punished by imprisonment for a term exceeding one year or at hard labor shall be prosecuted by indictment." Although the language of the Rule seems to require the result we reach in this case, the Notes of the Advisory Committee explain that the Rule is a product of the three indictment cases and the one-year limitation on the Attorney General's power to order penitentiary imprisonment.

new sentencing option to the trial judge, it requires no changes in the procedure by which guilt is determined or in the method by which offenders are brought into the criminal justice system. (*Compare McKeiver, supra,* 403 U.S. at 552, 91 S.Ct. 1976, White, J., concurring) (jury's function as a buffer to overzealous prosecutor unnecessary in context of distinctive intake policies of juvenile court system). Because the purposes of the YCA do not relate to trial or pretrial procedures, requiring an indictment of youthful offenders would not "provide an attrition of the [YCA's] assumed ability to function in a unique manner. (*McKeiver, supra,* at 547, 91 S.Ct. 1976.) The rehabilitative purposes of the YCA are implemented, if at all, after the youthful offender has been committed to the custody of the Attorney General. The consistency between the purposes of the YCA and the indictment clause is also evident in the fact that youth offenders are now entitled to an indictment if their crime is a felony. We know of no suggestion that indictments in the context of felony prosecutions have hindered the unique purposes of the YCA.

The extended commitment authorized by the YCA has been upheld against challenges under the equal protection component of the due process clause and the Eighth Amendment's prohibition of cruel and unusual punishments.[20] (*E. g., United States v. Leming* (9th Cir. 1975) 532 F.2d 647, *cert. denied* (1976), 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 749; *United States v. Rehfield* (9th Cir. 1969) 416 F.2d 273; *Car-*

ter *v. United States* (1962) 113 U.S.App. D.C. 123, 306 F.2d 283.) The rationale for upholding the Act was most frankly expressed in *Carter, supra,* by then Circuit Judge Burger:

"But the basic theory of that Act is rehabilitative and in a sense this rehabilitation may be regarded as comprising the *quid pro quo* for a longer confinement but under different conditions and terms that a defendant would undergo in an ordinary prison." 306 F.2d at 285.

Recently the District of Columbia Circuit, in a 6–4 en banc opinion, modified and extended that rationale to an indictment case. In *Harvin v. United States* (1971) 144 U.S.App.D.C. 199, 445 F.2d 675, 682, the court held that the YCA treatment requirement does not permit "confinement comparable to confinement in a penitentiary," and that therefore YCA treatment does not constitute infamous punishment requiring an indictment.

Because of our conclusions in Parts II and III, *supra,* we respectfully reject the method used by the *Harvin* majority to examine the YCA indictment problem and endorse instead Judge Tamm's recommendation in dissent that "the question of what constitutes an infamous punishment is an issue which is particularly appropriate for de novo examination." (*Id.* at 699.) As a result of our examination, we have held that the duration, as well as the conditions, of confinement, determines whether an indictment is constitutionally required.[21] Al-

---

20. *But cf. People v. Olivas* (1976) 17 Cal.3d 236, 131 Cal.Rptr. 55, 65–69, 551 P.2d 375. In *Olivas* the California Supreme Court held that it was an equal protection violation to allow a misdemeanant youth offender to be confined for a term longer than the maximum sentence which might have been imposed upon an adult. (The California Youth Authority legislation, Cal.Welfare & Inst.Code § 1700 *et seq.,* is very similar to the YCA.) The California court's approach to denominating the youth offender's liberty interest a "fundamental" interest for purpose of equal protection analysis is similar to the approach taken here in concluding that the loss of liberty is an infamous punishment for purpose of the Fifth Amendment. *See* 17 Cal.3d at 241–251, 131 Cal.Rptr. at 58–65, 551 P.2d at 378–385. The unstated premise of the *Olivas* decision is a recognition that the length

of incarceration is the only relevant yardstick by which to compare the severity of non-capital punishments. *See* 17 Cal.3d at 240–243, 131 Cal.Rptr. at 57–59, 551 P.2d at 377–379.

21. Even if we were to adopt the approach of the *Harvin* majority, it is not at all clear that confinement under the YCA is substantially different from imprisonment in a penitentiary. A youth offender is sentenced to the custody of the Attorney General for "treatment and supervision." (18 U.S.C. § 5010(b), (c).) The Act defines "treatment" as "corrective and preventive guidance and training designed to protect the public by correcting the antisocial tendencies of youth offenders." (18 U.S.C. § 5006(g).) Treatment is to be provided in institutions of maximum, medium, and minimum security (18

though the YCA promotes rehabilitation rather than punishment of youth offenders, we conclude that youths are punished, and punished infamously, for their criminal behavior. That punishment is the deprivation of liberty for as long as six years and the subjection, during that period, to the control and supervision of the Attorney General. Although the Act may restrict the methods by which the Attorney General controls and supervises youth offenders, that restriction does not diminish the punitive element inherent in confinement. A youthful offender is not voluntarily submitting to treatment; he is deprived of his freedom and subjected to the control of the state because of his criminal action. The fact that Congress has decided that some unspecified form of treatment is a more effective sanction against criminal behavior than mere custody does not make a deprivation of liberty, imposed under the criminal law, an act of benevolence rather than punishment. A youthful offender's loss of freedom is as serious and significant as that of an adult offender and the procedural protections afforded the latter cannot be denied the former.

Our construction of the indictment clause results, in YCA cases, in applying the indictment clause to misdemeanor prosecutions. The *Harvin* majority found this result significant in that it "would be contrary to the reason which gave rise" to the distinction between infamous and non-infamous crimes; *i. e.*, that a crime was characterized as infamous because of its seriousness. (*Harvin, supra*, at 678.) Even if history supported the *Harvin* court's view of the origins of the term "infamous crime," its construction of the indictment clause cannot be reconciled with the Supreme Court's opinions in *Wilson* and *Moreland*.

U.S.C. § 5011), and the Attorney General may confine the youth offender and afford him treatment "under such conditions as he believes best designed for the protection of the public." (18 U.S.C. § 5015(a)(3).) Whatever the decision of the Attorney General as to the institution and conditions of confinement, the Act requires that "[i]nsofar as practical" youth offenders should be confined in separate institutions and segregated from other offenders. (18 U.S.C. § 5011.)

We find it difficult to distinguish between the Attorney General's statutory powers under the YCA and his authority pertaining to the general prison population. Congress has clearly expressed its intention that all prisoners should receive "an individualized system of discipline, care, and treatment." (18 U.S.C. § 4081.) To insure implementation of that goal, the Attorney General is empowered to provide for the "proper government, discipline, treatment, care, rehabilitation, and reformation" of federal prisoners. (18 U.S.C. § 4001.) In short, rehabilitative treatment is not a novel technique applied only to youth offenders and denied adult prisoners; rehabilitation is the congressionally declared goal of the entire federal penal system.

Of course, the mere fact that rehabilitation is a general goal of the federal system does not necessarily lead to the conclusion that the methods of rehabilitation used in YCA institutions (or in other federal institutions) constitute infamous punishment. The common goal of rehabilitation in youth and adult institutions does, however, seriously call into question a Fifth Amendment distinction based only on the YCA's prescription of treatment. "Congress'

emphasis on 'treatment' rather than 'punishment' . . . should serve as the starting point of our inquiry rather that the conclusion." (*Harvin v. United States, supra*, at 693 (dissenting opinion of Judge Tamm).) The distinguishing characteristics of YCA confinement, if any exist, are not found in vague statutory language shared by that Act and the provisions relating to all federal prisoners. If YCA confinement is different, to the point of constitutional significance, from ordinary imprisonment, the differences can be demonstrated only by examining the institutions in which and the conditions under which youth offenders are confined. Any attempt to determine whether YCA confinement is equivalent to penitentiary imprisonment is complicated by the differences between federal penitentiaries today and the state penitentiaries that were used at the time the Supreme Court settled upon its definition of "infamous punishment." Moreover, because the indictment cases are unclear as to what particular characteristics of nineteenth century prisons were important in the determination that penitentiary imprisonment was infamous punishment, it is especially difficult to discover whether YCA institutions have those characteristics.

The sparse factual record and briefs in this case prevent us from making any meaningful comparison between YCA confinement and penitentiary imprisonment. We note only that neither the statutory language of the YCA nor the cursory analysis of that Act in *Harvin* is adequate to resolve the issue.

*Wilson* clearly rejected a definition of infamy that depended on the inherent nature of the crime, and adopted instead " 'one founded in the opinions of the people respecting the mode of punishment.' " 114 U.S. at 422, 5 S.Ct. at 937, *quoting* Eden, Principles of Penal Law.) The Court recognized that "infamous crimes" might "be held to include also crimes infamous in their nature" *id.* at 424, 5 S.Ct. at 938, but held that the scope of the indictment clause "depends upon the consequences to [the defendant] if he shall be found guilty" *id.* at 423, 5 S.Ct. at 938. Although *Wilson* did refer to the English practice of using indictments for felony prosecutions *id.* at 423, 5 S.Ct. 935, the Court refrained from construing the indictment clause to be applicable only to felonies. Moreover, in *Moreland*, the Court necessarily rejected the felony-misdemeanor distinction when it held that hard labor, imposed as punishment for the misdemeanor of wilfully neglecting to support minor children, is infamous punishment and triggers the right to an indictment. (258 U.S. 433, 441, 42 S.Ct. 368, 66 L.Ed. 700. *See also Cleveland v. Mattingly* (1923) 52 U.S.App.D.C. 374, 287 F. 948, 950–51.)

By tailoring the YCA to a specific age-class of offenders, Congress has created a dual system of criminal sanctions. One class of misdemeanor offenders, those under the age of 26, is "in danger of an infamous punishment if convicted." (*Moreland, supra*, 258 U.S. at 441, 42 S.Ct. at 371), the other, adult offenders, is not.[22] We do not believe that the Constitution permits Congress on the one hand, to determine that an offense is not worthy of an indictment and, on the other hand, impose a sanction that would trigger the indictment requirement if it were applied to all offenders. In determining whether a youthful offender is entitled to an indictment, we must look to "the consequences to [the defendant] himself," not to the consequences to his adult counterpart.

REVERSED.

CHAMBERS, Circuit Judge (dissenting):

I dissent from the majority opinion on two grounds. First, the constitution requires prosecution by indictment where a person is accused of a capital or infamous crime. The constitutionally relevant factor in determining if a criminal accused is entitled to be proceeded against only by indictment is the nature of the crime of which he is accused and the punishment that is attached to it. Ramirez was charged with a violation of 21 U.S.C. § 844, which carries a maximum term of imprisonment of one year. Under the Federal Rules of Criminal Procedure [Rule 7(a)], and under the test for infamous crime established by the majority, a crime which carries a maximum sentence of one year does not require prosecution by indictment. A sentence under the Federal Youth Corrections Act depends on the age of the defendant and not on the nature of the underlying crime. I cannot, therefore, see how such a sentence can measure the infamy of the underlying crime. See *Harvin v. United States*, 144 U.S.App.D.C. 199, 445 F.2d 675, 677–79 (1971). The crime here involved is not an infamous one requiring an indictment under the federal rules or the constitution. I would not hold the use of the supervisory term allowed by the Youth Corrections Act turns a non-infamous crime into an infamous one.

Further, even if the majority's premise, that we must look to the possibility of a Youth Corrections Act sentence in determining if a crime is infamous, is correct, the opinion begs its own central question. The majority equates infamous crime with infa-

---

**22.** The YCA authorization of felony penalties for misdemeanor violations is an anomaly in the federal criminal law. In prescribing the period for which juveniles may be committed to the custody of the Attorney General, Congress expressly prohibited a term which exceeds "the maximum term which could have been imposed on an adult convicted of the same offense." (18 U.S.C. § 5037(b).) Similarly, the sentencing provisions for a "dangerous special drug offender" apply only to felony violations and even then the sentence cannot be "disproportionate in severity to the maximum term otherwise authorized by law for [the] felonious violation." (21 U.S.C. § 849(a), (b).)

mous punishment. Severity or infamy of a punishment must of necessity be a function of the conditions of that punishment, not merely its duration. The majority explicitly recognizes that the record before us gives no indication of the manner of confinement when a youthful offender is committed to a youth institution. If the relevant standard in this case is the severity of the Youth Act sentence, I cannot see how on the record before us we can determine that six years at a federal youth center is more severe punishment than one year in a federal penitentiary. The special rehabilitative treatment to be provided by the Youth Corrections Act should not be presumed to be infamous punishment without any factual development as to its conditions.

## ON REHEARING

The Government's petition for rehearing is granted.

The Government's petition for rehearing discloses for the first time the fact that criminal proceedings against Ramirez were initially instituted by indictment, and not by information as represented by both parties in briefs and oral arguments anteceding our prior opinion.[1] After our opinion came down, the Government sought and was granted leave to augment the record to accompany its rehearing petition to show the procedural history of the case. The supplemental record reveals that Ramirez was first indicted on November 28, 1973, for unlawful importation of marihuana, possession of marihuana with intent to distribute, and smuggling marihuana in violation of 21 U.S.C. §§ 841(a)(1), 952, 960, and 963, and 18 U.S.C. § 545—all felonies. On February 20, 1974, the Government filed a superseding criminal information charging Ramirez

with unlawful knowing possession of 55 pounds of marihuana in violation of 21 U.S.C. § 844, a misdemeanor. No objection of any kind was made to this procedure. Instead, Ramirez waived a jury, and the case was tried to the court on stipulated facts.[2] When Ramirez appeared for sentencing, the court deferred further proceedings pursuant to 21 U.S.C. § 844(b)(1), and, with Ramirez' express consent, placed him on probation; it then dismissed the underlying felony indictment. Again, Ramirez made no objection of any kind.

On November 1, 1974, Ramirez reappeared in response to an order to show cause why his probation should not be revoked. The court revoked his probation and, after a hearing, committed Ramirez for a study under 18 U.S.C. § 5010(e) upon finding that he was suitable for Youth Corrections Act treatment. On February 7, 1975, the court committed Ramirez for treatment and supervision under 18 U.S.C. § 5010(b), over his lawyer's objection that a Youth Act sentence was not appropriate for an offense under 21 U.S.C. § 844. Ramirez appealed from the order revoking his probation.

█ The premise of our opinion on the record then before us was that Ramirez' prosecution had been initiated by information, not by indictment. The augmented record establishes that that premise was factually unfounded, and our prior opinion cannot stand. As the full history has unfolded, it is evident that the case does not present the constitutional issue that we earlier decided. Ramirez, through his lawyer, made no objection to the superseding information, and the underlying indictment was not dismissed until Ramirez was sentenced

1. The Government's brief on appeal stated the question on appeal:

 "Whether sentencing under the Federal Youth Corrections Act requires appellant to be proceeded against by indictment." In stating the procedural history of the case, the Government's brief referred only to the criminal information upon which the appellant was convicted. Appellant's statements of the question on appeal and of the procedural history were almost identical to the Government's.

2. The case is not controlled by *United States v. Leming* (9th Cir. 1975) 532 F.2d 647, because there was no formal guilty plea. However, we are aware that the proceedings were conducted in an atmosphere redolent of plea bargaining that culminated in a submission to the court on stipulated facts, accurately termed in lawyers' cant "a slow plea of guilty."

upon the information. (*United States v. Golden* (9th Cir. 1976) 532 F.2d 1244 (constitutional claim regarding special parole term for drug offenders would not be heard for first time on appeal); *United States v. Hord* (9th Cir. 1972) 459 F.2d 1003 (constitutional objection to Narcotics Addict Rehabilitation Act could not be raised on appeal). *See also United States v. Malcolm* (9th Cir. 1973) 475 F.2d 420; *Estrella v. United States* (9th Cir. 1970) 429 F.2d 397.)

 Ramirez also contends, in response to the Government's rehearing petition, that we should reexamine *Eller v. United States* (9th Cir. 1964) 327 F.2d 639, upholding imposition of a Youth Corrections Act sentence for a misdemeanor, in the light of the realities of such commitments as described by Judge Weigel, dissenting in *United States v. Leming* (9th Cir. 1975) 532 F.2d 647, at 652 *et seq.*, and recognized by the Second Circuit in *United States ex rel. Sero v. Preiser* (2d Cir. 1974) 506 F.2d 1115. (*See also Harvin v. United States* (1971 en banc) 144 U.S.App.D.C. 199, 445 F.2d 675, 680–82, 689–90, 693–701; *People v. Olivas* (1976) 17 Cal.3d 236, 131 Cal.Rptr. 55, 551 P.2d 375.) The facts may be that the correctional facility in which Ramirez may be confined is every bit as bad or worse than an adult prison, but those facts are not contained in this record and we cannot reach the issue.

The opinion is ordered withdrawn, and the order below is affirmed.